MARTIN v CHILDREN'S AID SOCIETY

Docket Nos. 140360, 152486, 152489. Submitted March 9, 1995, at
    Detroit. Decided January 12, 1996, at 9:40 A.M. Leave to appeal
    sought.

Michael and Cynthia Martin brought an action in the Wayne
    Circuit Court against the Children's Aid Society (CAS), Bennie
    Stoval, the director of the CAS, Celia B. Clayton, a CAS em-
    ployee, and others, including the Department of Social Services,
    alleging that the defendants had caused them to be and to
    remain wrongfully separated from their daughter, who had
    been taken from them and placed in foster care for several
    years because of suspected child abuse. The Martins thereafter
    brought a separate action in the Wayne Circuit Court against
    Warren Swihart and Kathy Hart, DSS employees, Andrea Zak
    and Kim Travis-Ewing, CAS employees, and others, again alleg-
    ing the same wrongful separation from their child. The actions
    were consolidated. The court, James J. Rashid, J., acting on
    behalf of Cynthia Diane Stephens, J., granted summary disposi-
    tion for Swihart and Hart on the basis of qualified immunity.
    The plaintiffs appealed. The court, Cynthia Diane Stephens, J.,
    although having denied summary disposition for the CAS and its
    employees on the basis of immunity, granted summary disposi-
    tion for those defendants on the bases of the failure to state a
    claim and the absence of any genuine issue of material fact.
    The plaintiffs appealed with respect to defendants Zak and
    Travis-Ewing, and those defendants cross appealed. The plain-
    tiffs appealed separately with respect to defendants CAS, Stoval,
    and Clayton, and those defendants also cross appealed. The
    appeals were consolidated.

    The Court of Appeals *held:*

    1. Swihart and Hart, as DSS employees, were protected from
    liability unless their conduct violated a clearly established
    statutory or constitutional right of the plaintiffs of which those
    defendants should have known. Although there is a constitu-
    tional right to family integrity, that right is not absolute and

REFERENCES

Am Jur 2d, Infants § 55.
See ALR Index under Children.

must be balanced against the state's interest in protecting a child's health and welfare. Because the involvement of Swihart and Hart was limited to the review of the reports filed by the CAS personnel and because there was no evidence that Swihart and Hart knew that the plaintiffs' constitutional or statutory right to reunification was being denied, the trial court correctly granted summary disposition for those defendants on the basis of qualified immunity.

2. Social workers are immune from liability with respect to activities involving the initiating and monitoring of child placement proceedings and placements in cases in which there is close oversight of the social workers' placement recommendations by the probate court. Because the claims of the plaintiffs related to activities of the CAS and its employees involving activities and recommendations concerning placement that were directed to and considered by the probate court, the trial court should have granted summary disposition for the CAS defendants on the basis of immunity.

3. Although the trial court incorrectly denied summary disposition for the CAS defendants on the basis of immunity, the trial court did reach the right result by granting summary disposition for them on other grounds.

Affirmed.

WHITE, P.J., concurring in part and dissenting in part, stated that the trial court properly granted summary disposition for the DSS defendants on the basis of qualified immunity, properly denied summary disposition for the CAS defendants on the basis of immunity, and erred in granting summary disposition for the CAS defendants except Bennie Stoval pursuant to MCR 2.116(C)(8) and (10). Social workers are not entitled to absolute immunity with respect to activities relating to child placement, and, because the activities alleged by the plaintiffs include activities that are not directly related to judicial proceedings, the CAS defendants are not entitled to quasi-judicial immunity. A claim of professional negligence was sufficiently a part of the case that the trial court erred in foreclosing pursuit of that claim on the bases that it was not pleaded and that amendment would be unduly prejudicial.

1. SOCIAL SERVICES — CASEWORKERS — IMMUNITY — CONSTITUTIONAL RIGHTS — FAMILY INTEGRITY.

Caseworkers with the Department of Social Services are immune from liability for activities undertaken in the course of the employment unless their conduct violates a clearly established statutory or constitutional right of the plaintiffs of which the defendants should have known; although there is a constitu-

tional right to family integrity, that right is not absolute and must be balanced against the state's interest in protecting a child's health and welfare.

2. SOCIAL SERVICES — CASEWORKERS — IMMUNITY — CHILD PLACEMENT PROCEEDINGS.

Social workers are immune from liability with respect to activities involving the initiating and monitoring of child placement proceeding and placements in cases in which there is close oversight of the social workers' placement recommendations by the probate court.

*Schreier & Weiss, P.C.* (by *Jay B. Schreier*), for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Stewart H. Freeman* and *Margaret A. Nelson,* Assistant Attorneys General, for Warren Swihart and Kathy Hart.

*Jenkins, Nystrom & Hitchcock* (by *Reuben M. Waterman*), for the Children's Aid Society and its employees.

Before: WHITE, P.J., and BANDSTRA and W. P. CYNAR,* JJ.

BANDSTRA, J. In these consolidated cases, plaintiffs sued various defendants, including employees of the Department of Social Services (the DSS defendants) and the Children's Aid Society and four of its employees (the CAS defendants). The trial court granted defendants' motions for summary disposition and denied plaintiffs' motion for leave to amend their complaint. We affirm.

On December 18, 1984, plaintiffs brought their thirteen-week-old daughter, Ashley Lynn, to an emergency pediatric clinic. Blood tests and x-rays revealed that Ashley was suffering from pneumo-

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

nia, numerous broken ribs (possibly as many as eighteen) in various stages of healing, fractures of both femurs, a bruise on the lower back, and a bruise on the left leg. The doctor suspected abuse, and the DSS filed an emergency petition with the Wayne County Probate Court, requesting that Ashley be temporarily detained. The order was issued. Thereafter, another petition was filed, requesting that Ashley be made a temporary ward of the court. Plaintiffs denied that they had abused Ashley and requested a jury trial with respect to the allegations contained in the petition.

Trial originally was scheduled for August 1985, but was adjourned by mutual agreement of the parties. Plaintiffs wanted extra time to determine if brittle bone disease or some other medical problem might explain Ashley's injuries. In January 1986, a trial was held in which the jury found that the DSS had proven by a preponderance of the evidence that Ashley had been abused and that she should be made a temporary ward of the court. At trial, plaintiffs presented evidence that Ashley possibly suffered from a medical disorder (e.g., copper deficiency) that made her susceptible to bone fractures, and the DSS presented evidence that Ashley's injuries were the result of abuse.

The DSS had contracted with the CAS, a private organization, to provide services for neglected and abused children. When Ashley was removed from plaintiffs' care, the DSS transferred her to the CAS, which placed her in a foster home. After the jury trial in January 1986, additional hearings were held before the probate court pursuant to MCL 712A.19; MSA 27.3178(598.19) and MCR 5.973. On February 24 and 25, 1986, a dispositional hearing was held to determine whether Ashley should be returned to plaintiffs. The DSS asserted that a potential for reabuse existed until plaintiffs admit-

ted responsibility for Ashley's injuries. Plaintiffs continued to claim that they had never abused Ashley. After hearing the evidence presented by both sides, the probate court continued Ashley in foster care. At a review hearing held in August 1986, Ashley was again continued in foster care.

At a March 1987 review hearing, plaintiffs argued a motion for a new trial. Plaintiffs presented evidence from two physicians stating that Ashley's injuries were caused by a copper deficiency or some other metabolic disorder. The court denied the motion, stating that it did not believe that the documents from the physicians constituted newly discovered evidence. The court continued Ashley in foster care.

At an October 1987 statutory rehearing, two additional reports were submitted into evidence. The first report, from a pediatric psychology professor, recommended that Ashley be slowly returned to plaintiffs' care. The second report, from a pediatric therapist, stated that continued placement of Ashley in foster care could cause irreparable psychological and emotional damage to her. At the conclusion of the hearing, the court stated that it would not reconsider the issue of what caused Ashley's injuries because the issue had been resolved at the jury trial in January 1986. The court ordered Ashley's attorney to locate a neutral therapist to immediately implement an observational treatment situation between plaintiffs and Ashley. Ashley was continued in foster care.

Another hearing was held on January 13, 1988. A neutral therapist who would be agreeable to all parties had not yet been located. The foster care worker testified that Ashley had recently become more anxious and aggressive. Although the foster care worker did not recommend that Ashley be

returned home, he did recommend that plaintiffs be allowed to assume greater responsibility for Ashley. The court continued Ashley in foster care.

While Ashley was in foster care, plaintiffs filed a claim of appeal in the Court of Appeals, asserting that the probate court lacked jurisdiction over the matter and that the probate court's continued placement of Ashley in foster care constituted an abuse of discretion. The Court of Appeals dismissed the claim of appeal. The Supreme Court remanded to this Court for plenary consideration, as on leave granted. *In re Martin,* 429 Mich 852 (1987). On April 5, 1988, this Court affirmed the probate court's jurisdiction, but reversed the order continuing Ashley's placement in foster care and remanded for further proceedings. *In re Martin,* 167 Mich App 715, 733; 423 NW2d 327 (1988). As a result of these proceedings, Ashley was returned to plaintiffs' care.

Thereafter, plaintiffs filed two lawsuits, claiming that they had been wrongly separated from Ashley. Plaintiffs made various allegations against defendants, including negligence, breach of statutory and contractual duties, bad faith, and violation of their constitutional rights. The trial court subsequently granted the DSS defendants' motion for summary disposition on the basis of qualified immunity. With regard to the CAS defendants, the trial court denied their motion for summary disposition on the basis of absolute immunity, but granted the motion pursuant to MCR 2.116(C)(8) (failure to state a claim) and (C)(10) (no genuine issue of material fact). The trial court dismissed plaintiffs' claims and denied plaintiffs' motion for leave to amend their complaint. Plaintiffs now appeal as of right, and the CAS defendants cross appeal.

I

The DSS defendants were protected from liability unless their conduct violated a clearly established statutory or constitutional right of plaintiffs of which the DSS defendants should have known.[1] *Harlow v Fitzgerald,* 457 US 800, 818; 102 S Ct 2727; 73 L Ed 2d 396 (1982). As plaintiffs argue, there is a constitutional right to family integrity. *Santosky v Kramer,* 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). However, this is not an absolute right, and it must be balanced against the state's interest in protecting children's health and welfare. *Frazier v Bailey,* 957 F2d 920, 929-930 (CA 1, 1992). See also *Santosky, supra* at 766 (state has parens patriae interest in the welfare of the child). Similarly, the statute that plaintiffs rely upon as granting them a right[2] to reunification with Ashley only states that reunification "may" occur "as soon as it appears possible." MCL 400.18c; MSA 16.418(3).

The trial court correctly granted summary disposition for the DSS defendants. Their involvement with the case was only to review reports filed by the CAS personnel contracted to handle Ashley's placement. There is no factual evidence to support a finding that, in doing so, the DSS defendants knew that plaintiffs' constitutional or statutory right to reunification was being denied. That right had to be balanced against the interest in protecting Ashley's health and welfare, including protecting her from abuse. In repeatedly adopting the CAS

[1] The DSS defendants may also be protected by judicial immunity as discussed in part II of this opinion. However, plaintiffs' claim against the DSS defendants rests, in part, upon 42 USC 1983, and it is not clear whether judicial immunity is afforded to social workers under that statute. *Hoffman v Harris,* 511 US —; 114 S Ct 1631; 128 L Ed 2d 354 (1994) (Thomas, J., dissenting).

[2] We assume without deciding that the statute plaintiffs rely upon grants them a right.

recommendations against reunification, the probate court implicitly determined that this approach represented an appropriate balancing of these competing interests. Nothing in the record indicates that, by similarly accepting the CAS recommendations, the DSS defendants' conduct violated any statutory or constitutional interest plaintiffs had in reunification.

II

In their cross appeal, the CAS defendants argue that the trial court improperly denied their motion for summary disposition on the basis of immunity. We agree.[3]

Federal appellate courts have extended absolute immunity to social workers initiating and monitoring child placement proceedings and placements in cases similar to the instant case.[4] *Babcock v Tyler,* 884 F2d 497 (CA 9, 1989); *Vosburg v Dep't of Social Services,* 884 F2d 133 (CA 4, 1989); *Coverdell v Dep't of Social & Health Services,* 834 F2d 758 (CA 9, 1987); *Meyers v Contra Costa Co Dep't of Social Services,* 812 F2d 1154 (CA 9, 1987); *Kurzawa v Mueller,* 732 F2d 1456 (CA 6, 1984).[5]

[3] Because we decide that summary disposition should have been granted on immunity grounds, we do not reach the issues plaintiffs raise on appeal regarding the propriety of the trial court's later dismissal of their complaint against the CAS defendants on other grounds.

[4] As noted earlier, immunity may be unavailable for social workers in an action brought under 42 USC 1983. However, plaintiffs do not allege a cause of action against the CAS defendants under that section. The concerns expressed by Justice Thomas in *Hoffman* regarding whether social workers existed or were provided immunity when § 1983 was enacted in 1871 are thus not applicable. See *Hoffman, supra* n 1, 128 L Ed 2d 355-356 (Thomas, J., dissenting).

[5] We find all these cases persuasive with respect to the CAS defendants, even though, as the dissent points out, most involved governmental employees. The distinction between governmental and nongovernmental employees is important only under statutes like MCL 691.1407(5); MSA 3.996(107)(5), but no such statute was at issue in

These precedents recognize the important role that social workers play in court proceedings to determine when to remove a child from the home and how long to maintain the child in foster care. They also recognize that, to do that difficult job effectively, social workers must be allowed to act without fear of intimidating or harassing lawsuits by dissatisfied or angry parents. *Kurzawa, supra* at 1458.

> [C]aseworkers need to exercise independent judgment in fulfilling their post-adjudication duties. The fear of financially devastating litigation would compromise caseworkers' judgment during this phase of the proceedings and would deprive the court of information it needs to make an informed decision. . . . There is little sense in granting immunity up through adjudication . . . and then exposing caseworkers to liability for services performed in monitoring child placement and custody decisions pursuant to court orders. [*Babcock, supra* at 503.]

Accord *Coverdell, supra* at 765 ("[T]o permit the [social] worker to become 'a lightning rod for harassing litigation . . .' would seriously imperil the effectiveness of state child protection schemes.").

---

these precedents, and the immunity we afford to the CAS defendants does not arise from this kind of statute. Further, while *Kurzawa* has been described as granting "blanket absolute immunity" to social workers, as the dissent notes, our decision is not properly so described. It is limited to the facts of this case, in which the close oversight of the social worker's placement recommendations by the probate court is especially noteworthy. Finally, the dissent correctly notes that these cases all involved § 1983 claims, but the immunity afforded seems equally available with regard to other claims. See, e.g., *Kurzawa, supra,* 732 F2d 1458 (in dicta, the court noted that "notwithstanding their already successful statute of limitations defense, the other defendants [a psychologist, two psychiatrists, and a lawyer functioning as guardian ad litem sued under negligence, malpractice, and other state law theories] would have also been entitled to immunity").

When a court is involved, granting immunity from civil suit does not mean that the parents of a child taken from their home are without recourse to contest wrongful conduct by a social worker. "The parent of the apprehended child is not left remediless—he or she may always attack the court's order directly or on appeal." *Id.* Accord *Vosburg, supra* at 136 ("[S]afeguards against . . . misconduct were built into the . . . adjudication process itself.").

Although we have found no Michigan precedent regarding this question, we find convincing the decisions granting absolute immunity to social workers. As the CAS defendants persuasively point out in their brief, absolute immunity is necessary to assure that our important child protection system can continue to function effectively:

> No more heinous act can be alleged than the physical abuse of a helpless infant by an adult. The volatile mix of accused parents, deprived of the custody of the baby, observing it in the care of foster parents, finding themselves in the unfamiliar confines of the court system, required to retain counsel at great cost, subject to the social services bureaucracy and its necessary interrogation and probing of the most intimate aspects of the family psyche, is almost guaranteed, rightly or wrongly, to produce resentment and a desire for retribution by the parent. Many parents in this situation are seriously psychologically disturbed.
>
> Professional assistance to the Probate Court is critical to its ability to make informed, life deciding judgments relating to its continuing jurisdiction over abused children. Its advisors and agents cannot be subject to potential suits by persons, aggrieved by the Court's decision vindictively seeking revenge against the Court's assistant as surrogates for the jurist. Faced with such liability, the social worker would naturally tend to act cau-

tiously and refrain from making difficult decisions, delay in intervening to protect the child, avoid confronting the aggressive parent with the necessity of changing his attitudes and seeking psychiatric help to do so. Such an atmosphere defeats the function of the continuing jurisdiction of the Probate Court in the abstract, and in reality poses the potential for death for an abused child who is not protected because the social worker exercised excessive caution in arriving at a judgment as to whether there is sufficient evidence of abuse to merit action on his or her part.

Mere qualified immunity is not enough protection to prevent the chilling effect of a potential suit on the exercise of a social worker's professional judgment and discretion in operating as an arm of the Probate Court to protect abused children. This litigation is vivid proof of that. Judge Stephens has ruled that Cross-Appellants have qualified immunity, but that has not prevented years of litigation. The threat of a suit like this one could make any social worker back off from making discretionary decisions that he or she would otherwise believe to be in the child's best interest.

Further, plaintiffs have not been without a remedy regarding the allegedly wrongful conduct of the CAS defendants. The probate court regularly reviewed the placement recommendations of the CAS defendants at statutorily required hearings. This provided judicial oversight sufficient to protect plaintiffs from allegedly wrongful conduct against their interests by the CAS defendants. Plaintiffs had the statutory right to request accelerated hearings to contest their case service plan. MCL 712A.19(3); MSA 27.3178(598.19)(3). The probate court had broad power to address concerns with the case service plan if, after a hearing, they were found to be legitimate. MCR 5.973(B). To allow plaintiffs additional protection in the form of

a cause of action against the CAS defendants for money damages would be too costly; it would "disserve the broader public interest in having participants [in contested child protection cases] . . . perform their respective functions without fear of having to defend their actions in a civil lawsuit." *Babcock, supra* at 502.

Although the trial court incorrectly denied summary disposition for the CAS defendants on the basis of immunity, the trial court did reach the right result by granting them summary disposition on other grounds. *In re Powers*, 208 Mich App 582, 591; 528 NW2d 799 (1995); *Henry v Hospital & Health Services Credit Union*, 164 Mich App 90, 94; 416 NW2d 338 (1987). The trial court's order granting summary disposition for the DSS defendants and for the CAS defendants are affirmed.

We affirm.

W. P. CYNAR, J., concurred.

WHITE, P.J. *(concurring in part and dissenting in part)*. I agree with the trial court that plaintiffs failed to make the requisite showing of bad faith on the part of the Department of Social Services defendants, Kathy Hart and Warren Swihart, and thus I concur in the affirmance of the trial court's grant of summary disposition for these defendants.

I dissent from the majority's reversal of the trial court's denial of the Children's Aid Society (CAS) defendants' motion for summary disposition on absolute immunity grounds.[1] I also conclude that the trial court erred in granting summary disposition pursuant to MCR 2.116(C)(8) and (10), a question not reached by the majority.

---

[1] I agree with the result with respect to Stoval, concluding that Stoval has not been shown to have been involved in the management of plaintiffs' case.

I

In addition to the facts set forth in the majority opinion, I note that Ashley remained in foster care under the supervision of the CAS and the DSS from December 19, 1984, to May 19, 1988. Throughout that time, plaintiffs denied having abused Ashley and presented medical evidence that supported their claim that Ashley's injuries resulted from a congenital defect. Nonetheless, the DSS and the CAS insisted that plaintiffs admit responsibility for Ashley's injuries as a precondition of moving toward reintegration of the family and returning Ashley to their custody. *In re Martin,* 167 Mich App 715, 719; 423 NW2d 327 (1988). In the appeal from the probate court, this Court quoted extensively from a report by a pediatric psychologist submitted at one of the statutory rehearings, held in October 1987, which referred to defendants' insistence that plaintiffs "confess":

1. A major issue in this case is whether Ashley's medical condition at the time of the original report to Children's Protective Services was due to child abuse or copper deficiency. The full report from Dr. Paterson and confirmatory evidence from Dr. Parfitt were not available to the jury which heard the case in January of 1986. These reports are sufficiently convincing as to throw doubt on the original diagnosis of child abuse, which was made on the basis of the finding of multiple fractures in different stages of healing.

2. A second major issue in the case has been the *continuing demand by professionals that the Martins accept responsibility for Ashley's fractures. There has been an assumption that the Martins' failure to confess guilt means that Ashley cannot be safe in their home, even for a trial period, such as overnight or on weekend visitations.*

*These two issues have interacted to keep any*

*progress from occurring in reuniting this family.*
If, in fact, the Martins were not responsible for the
injuries to their daughter, Ashley, but the injuries,
rather, were the result of copper deficiency, the
demand that the parents accept responsibility of
the injuries makes no sense. Furthermore, al-
though acceptance of responsibility by the perpe-
trator is often a treatment goal in child protection
cases, particularly cases of incest, it is not un-
known for children to be returned to their natural
families even when a specific perpetrator has not
been identified. Gradual return of children in cases
where there is no criminal prosecution is the
general practice, not the exception, with close
medical monitoring to insure that reinjury does
not occur. [*Id.* at 728 (emphasis added).]

Another report from Dr. Coy Denton Sims, a Ph.D.
in pediatric-child-school and family therapy, noted
that plaintiffs attended three separate parenting
seminars, received certificates of honor from two of
them, and underwent nearly three years of evalua-
tions and psychotherapy. Dr. Sims believed there
would be no risk in returning Ashley to plaintiffs.
*Id.* at 721, 730-731. Finally, this Court noted:

Since the adjudicative hearing [in January
1986], petitioner has presented no evidence, except
for the fact of Ashley's injuries, that respondents
were, or could be, abusive to the child. While the
injuries themselves might be a strong indicia of
abuse where no legitimate explanation exists for
their infliction, such is not the case here. Very
persuasive evidence from Dr. Paterson and Dr.
Parfitt show that the cause was copper deficiency
or some similar metabolic disorder. Although, as
we have previously stated, enough contrary testi-
mony exists for affirming the probate court's juris-
diction over Ashley, *that evidence certainly de-
feats petitioner's past insistence that respondents
admit responsibility for the abuse before it would
consider returning the child. Such rigidity has no*

*place in our child welfare system.* As stated in the report by Dr. Sims: "A life sentence (or three years) for Ashley appears beyond the purpose of the Department of Social Services or intent of the court." [*Id.* at 731-732 (emphasis added).]

DSS defendant Hart, Swihart's supervisor, testified she and Swihart became involved in the Martin case around April 1, 1986. Swihart testified at deposition that the permanency plan when Ashley was first placed in the court's wardship was to reunite her with plaintiffs. However, in March 1987 the plan changed to file for permanent custody and a termination of plaintiffs' parental rights. Swihart testified that the reason for this change was that CAS defendant Celia B. Clayton felt that "the parents were not recognizing that there was abuse." Swihart testified he agreed with Clayton's recommendation because he had "to go on what she's doing in her work and what she sees and reports to me," specifically, Ashley's reaction after she was with her natural parents for a short period. Swihart never observed plaintiffs with Ashley. Swihart testified that he did not know why plaintiffs were not allowed to visit with Ashley outside the CAS' premises between April 1986 and October 1987 and that "we let the contract agency run the case the way they feel—they're working directly with them." A petition for termination of plaintiffs' parental rights was never filed, however.

Subsequently, plaintiffs filed two civil complaints, which were amended several times to clarify and narrow the numerous theories alleged.

In their first suit, filed on March 10, 1988, plaintiffs named the DSS, the CAS, Bennie Stoval (CAS' director), Clayton, and Dr. Herman Schornstein, the doctor who evaluated plaintiffs and Ashley. Plaintiffs' original complaint alleged that the

CAS acted in bad faith by deliberately prolonging Ashley's temporary foster care, deliberately preventing meaningful contact between child and parents, deliberately allowing the foster parents to move 150 miles away, and insisting that plaintiffs confess to abusing Ashley as the precondition for her return and as the apparent precondition for any effort to reintegrate Ashley into the Martin home. Plaintiffs further alleged that the CAS, the DSS, and the individual defendants Hart, Kim Travis-Ewing, and Clayton acted in bad faith by intentionally creating and filing unfair, biased, and misleading reports.[2] Plaintiffs alleged they lacked an adequate remedy at law and had been unable to obtain an adjudication of their "constitutional and other claims under circumstances where lives are being destroyed by delay."

Plaintiffs' complaint was amended twice. Plaintiffs' motion to file a second amended complaint, stated that the proposed second amended complaint "clearly sets forth three Counts and three theories of recovery upon which plaintiffs seek damages from defendants."[3] The motion also stated that although the second amended complaint was substantially abbreviated, it was based on the identical facts alleged in the earlier pleadings and "merely seeks to identify with specificity the theories on which they seek relief."

---

[2] Plaintiffs alleged they were repeatedly threatened with permanent termination of their parental rights because they would not confess to abusing Ashley, but that no petition had ever been filed. Plaintiffs alleged that they were not told of the foster parents' move to Mt. Pleasant (150 miles away) until after the DSS and the CAS approved the move and that no court order was obtained permitting the move. Plaintiffs alleged that the DSS and the CAS conspired to and did obstruct justice in state court proceedings by conspiring with defendant Schornstein to change his medical recommendation regarding plaintiffs from favorable to harshly critical for the purpose of prevailing in a permanent termination proceeding and that Schornstein gave false testimony before the probate court.

[3] The trial court had requested clarification of plaintiffs' claims.

Plaintiffs' second amended complaint alleged in count I that defendants CAS, Stoval, and Clayton "by statute and pursuant to contract with the DSS," were obligated to direct its activities toward the reintegration of plaintiffs' family and that they owed plaintiffs a number of duties, which included to encourage and support an ongoing relationship between plaintiffs and Ashley, to identify and articulate barriers and problems inhibiting Ashley's return, to encourage and promote visitation, and to develop realistic treatment and service plans that would result in reunification of the family. No specific statute was mentioned. Plaintiffs alleged that the CAS defendants were negligent and breached each of those duties. Count II alleged that the CAS defendants breached the 1982 contract that they had with the DSS, referring to the duties outlined in count I. Count III alleged defendant Schornstein breached duties that he owed to plaintiffs, was negligent, and acted in bad faith by failing to consider adequately medical evidence suggestive of a physical etiology for Ashley's injuries, improperly evaluated plaintiffs' interactions with Ashley as consistent with parental abuse parents, and made recommendations regarding future interactions not for the purpose of eventual reunification of the family, but in bad faith and in conspiracy with the CAS and Clayton.

Plaintiffs' second suit was filed on March 2, 1989, after Ashley was returned to their custody. Plaintiffs named CAS caseworkers Andrea Zak and Travis-Ewing and DSS agents Swihart and Hart. The complaint alleged Zak and Travis-Ewing were responsible for overseeing the foster care placement and determining the permanent custody of Ashley and that they acted in bad faith and in a premeditated fashion by not filing a petition for termination or promoting Ashley's return, by deliberately prolonging temporary foster care, by

deliberately preventing meaningful contact between Ashley and plaintiffs, and by insisting that plaintiffs confess to having abused their daughter as the precondition for her return. Plaintiffs alleged that these defendants allowed the foster parents to move 150 miles away so as to attempt to permanently sever the parent-child relationship and prevent meaningful contact between plaintiffs and Ashley and, in bad faith, intentionally created and filed unfair and biased reports. Plaintiffs alleged that defendants Zak and Travis-Ewing individually and in conspiracy with Swihart and Hart acted in a gross, wanton, and wilful manner, in bad faith without adequate investigation, and in a conspiratorial manner to force plaintiffs to terminate their parental rights and that those defendants conspired to present inaccurate and misleading testimony in various court proceedings for the sole purpose of terminating plaintiffs' parental rights. Plaintiffs alleged that defendants Zak, Travis-Ewing, Swihart, and Hart knew or should have known that the allegations of child abuse against plaintiffs were false. Finally, without specifying the specific grounds relied on, plaintiffs alleged that they had suffered damages as a direct and proximate result of defendants' "negligence and unlawful and unconstitutional conspiratorial acts."

A litany of summary disposition motions were filed by defendants. Swihart, Hart, and Susan Green, DSS workers, moved for summary disposition pursuant to MCR 2.116(C)(7) and (8), contending they were entitled to absolute immunity, qualified immunity, and immunity under § 5 of the Child Protection Law, MCL 722.625; MSA 25.248(5), and that plaintiffs failed to state any valid claim against them.

The trial court found that although plaintiffs had a substantive due process right to reunifica-

tion of their family under the child welfare act,[4] which applies to post-dispositional monitoring and activities intended to reunify families, none of the evidence presented indicated that Swihart or Hart acted in bad faith. The court found that these acts did not rise to the level of bad faith necessary to support a constitutional claim, and the court concluded that defendants Swihart and Hart[5] were entitled to qualified immunity. The court granted their motion for summary disposition.

Dr. Schornstein moved for summary disposition on November 27, 1990, arguing that he was entitled to judicial immunity and that the claims against him lacked merit. On January 11, 1991, the cas, Stoval, and Clayton moved for summary disposition, arguing, inter alia, that they were entitled to absolute quasi-judicial immunity and governmental immunity.

On January 14, 1991, Zak and Travis-Ewing moved for summary disposition, arguing that they were also entitled to absolute quasi-judicial immunity and that plaintiffs' action was barred by collateral estoppel. Finding that the issue of absolute immunity for the cas, Stoval, Clayton, Zak, and Travis-Ewing (the cas defendants) had been previously considered and denied,[6] the court declined to reconsider it. However, the court found that the cas defendants would be entitled to qualified immunity unless plaintiffs could prove that they acted in bad faith. On these grounds, the

[4] The record indicates the trial court was referring to the Child Protection Law, MCL 722.621 et seq.; MSA 25.248(1) et seq.

[5] Defendant Green was also dismissed at this hearing.

[6] In May 1989, the cas, Stoval, and Clayton sought summary disposition on the basis that they are entitled to absolute immunity as "integral parts of the judicial process." The court granted the motion in part and denied it in part, striking allegations relating to conduct integral to the judicial process and concluding that plaintiffs also alleged conduct that would fall outside the scope of the judicial process.

court denied summary disposition in a March 14, 1991, order. The court also held that Dr. Schornstein was not entitled to absolute immunity though he could be entitled to qualified immunity.

All parties appealed. Finding that the March 14, 1991, order denying Zak and Travis-Ewing's motion for summary disposition was not a final order, a panel of this Court denied their appeal. However, this Court remanded the matter to the trial court with respect to the claim against Dr. Schornstein. Unpublished order of the Court of Appeals, entered October 17, 1991 (Docket No. 139548), which stated:

> The Court orders . . . the [two] orders of the Wayne Circuit Court [denying defendant Schornstein's motions for summary disposition] are vacated and the case REMANDED for further consideration not inconsistent with this order.
>
> Statements made by witnesses in the course of judicial proceedings are absolutely privileged provided they were relevant, material or pertinent to the issue being tried, and Michigan recognizes no cause of action for perjury or false swearing. *Meyer v Hubbell,* 117 Mich App 699, 704, 709; 324 NW2d 139 (1982). Testimony given by Dr. Schornstein at the dispositional hearing is therefore absolutely privileged. Furthermore, persons providing testimony, reports or other information at the request of the court which are [sic] relevant and material to proceedings following authorization of a petition for child abuse are immune from any subsequent legal action with respect to furnishing the information to the court. MCR 5.924. Any written or other information provided by Dr. Schornstein to the probate court at that court's request cannot be the predicate for any action against him.
>
> A governmental officer, employee, agent or volunteer is not liable in tort for injuries to persons or damages to property unless that person's con-

duct amounts to gross negligence that is the proximate cause of the injury or damage. Because Dr. Schornstein's testimony in court is absolutely privileged, plaintiffs cannot prevail unless they can show that Dr. Schornstein was grossly negligent in some other manner, and that such gross negligence was not only the cause in fact of any injury they suffered, but also was so significant and important as to be regarded as the proximate cause of plaintiffs' loss. In part, this depends on whether it is foreseeable that Dr. Schornstein's allegedly grossly negligent conduct could create a risk of harm to plaintiffs and whether the results of that conduct and intervening causes were foreseeable. *McMillan v State Highway Commission*, 426 Mich 46, 61-62; 393 NW2d 332 (1986). If reasonable minds could not differ regarding the application of the reasonableness of the risk of the harm, the question is one for the court. 426 Mich at 63.

On remand the circuit court shall reconsider Dr. Schornstein's motions for summary disposition in light of these authorities.

In December 1991, the CAS defendants again moved for summary disposition, arguing that they were entitled to absolute immunity on the basis of this Court's ruling in the Schornstein case. The trial court rejected the CAS defendants' argument under the law of the case and again denied their motion for summary disposition.

Plaintiffs and the remaining parties, the CAS, Stoval, Clayton, Travis-Ewing, and Zak, prepared for trial, which was set for April 1.

On April 24, 1992, the trial court entered sua sponte an order granting the CAS defendants summary disposition and dismissing all of plaintiffs' claims pursuant to MCR 2.116(C)(8) and (10).

II

I agree with the trial court that plaintiffs failed

to make the requisite showing of bad faith[7] on the part of DSS defendants Hart and Swihart, and, thus, I concur in the affirmance of the trial court's grant of summary disposition for these defendants.

### III

I dissent from the majority's reversal of the trial court's denial of the CAS defendants' motion for summary disposition on absolute immunity grounds.

### A

The CAS defendants are not government officials or employees, and governmental immunity is not properly extended to private actors. *Roberts v Pontiac,* 176 Mich App 572, 576-578; 440 NW2d 55 (1989); *Jackson v New Center Community Mental Health Services,* 158 Mich App 25, 34-35; 404 NW2d 688 (1987). A private party's performance of a governmental function does not confer governmental agency status on that entity. *Id.*

Defendants' citations of federal law notwithstanding, in Michigan absolute immunity is accorded only to

> judges, legislators, and the elective or highest appointive executive officials of all levels of government . . . from tort liability for injuries to persons or damages to property whenever they are acting within the scope of their judicial, legislative, or executive authority. [MCL 691.1407(5); MSA 3.996(107)(5).]

---

[7] The trial court at the summary disposition hearing, during a review of plaintiffs' attached excerpts of Swiehart's deposition, asked plaintiffs' counsel, "Counsel, you do not have any evidentiary items to present to this Court that would indicate that Mr. Swiehart [sic] was aware of any negligence, bad faith or conspiracy on the part of CAS; do you?" Plaintiffs' counsel responded, "No."

This standard applies to claims accruing after July 1, 1986, and is substantially similar to the prior standard set forth in *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 592; 363 NW2d 641 (1984), which governs claims accruing before July 1, 1986:

> Judges, legislators, and the highest executive officials of all levels of *government* are absolutely immune from all tort liability whenever they are acting within their respective judicial, legislative, and executive authority. [Emphasis added.]

Governmental officials who have been extended absolute immunity by Michigan courts when acting within their respective authority include: a county prosecutor,[8] the Detroit Police Department's chief of police,[9] the director and deputy director of the Department of Corrections,[10] and the state superintendent of public instruction.[11] With regard to governmental immunity of lower-level employees, qualified immunity is accorded to officers and employees of a *governmental* agency. *Ross, supra* at 592; MCL 691.1407(2); MSA 3.996(107)(2).

B

The cases relied on by the majority all involve § 1983 claims. Further, four of the five cases involve governmental employees, specifically social workers employed by various state departments of social services, or state departments of child pro-

---

[8] *Bischoff v Calhoun Co Prosecutor*, 173 Mich App 802; 434 NW2d 249 (1988).

[9] *Meadows v Detroit*, 164 Mich App 418; 418 NW2d 100 (1987).

[10] *Chivas v Koehler*, 182 Mich App 467, 471; 453 NW2d 264 (1990).

[11] *Berlin v Superintendent of Public Instruction*, 181 Mich App 154, 161-162; 448 NW2d 764 (1989).

tective services. *Babcock v Tyler,* 884 F2d 497, 498
(CA 9, 1989); *Vosburg v Dep't of Social Services,*
884 F2d 133, 134 (CA 4, 1989); *Coverdell v Dep't of
Social & Health Services,* 834 F2d 758, 759 (CA 9,
1987); *Meyers v Contra Costa Co Dep't of Social
Services,* 812 F2d 1154 (CA 9, 1987).

*Kurzawa v Mueller,* 732 F2d 1456 (CA 6, 1984),
the fifth case cited in the majority opinion, in-
volved seven defendants, three of whom were em-
ployees of Michigan's Department of Social Ser-
vices. *Id.* at 1457. The four remaining defendants
included two psychiatrists, one psychologist, and
an attorney acting as the child's guardian ad
litem; all were involved in the DSS' removal of the
child from his parents. *Id.* at 1457-1458. The *Kur-
zawa* court found all the defendants were entitled
to absolute immunity from the plaintiffs' 42 USC
1983 claim, but based its decision on the respective
functions: the DSS employees were immune be-
cause, as state employees, they had the responsi-
bility for the prosecution of child neglect and
delinquency petitions to protect the state's interest
in protecting the child and their conduct was
consequent to the' prosecution of the petition; the
psychiatrists and psychologist who examined the
child were immune because the information they
provided to the DSS and the courts was analogous
to the testimony of a witness; and the guardian ad
litem was entitled to immunity because of his
position within the judicial process. *Id.* at 1458.
Unlike the defendants in *Kurzawa,* the CAS defen-
dants are not psychiatrists, psychologists, or
guardians ad litem, nor are their challenged acts
relegated to participation in judicial proceedings.
Rather, plaintiffs assert the CAS defendants pro-
vided out-of-court foster care services that were a
product of their independent judgment as social
workers, including curtailing plaintiffs' visitation

with Ashley, threatening to terminate plaintiffs'
parental rights, insisting that plaintiffs confess to
abusing Ashley, and supervising the relationship
between the foster care and the visitations with
the natural parents in a manner so as to contra-
vene any possibility of reunification of the family.

Further, the *Kurzawa* holding regarding abso-
lute immunity applied only to the plaintiffs' 42
USC 1983 claims.[12] Indeed, the United States Su-

---

[12] The majority concedes, in its n 5, *ante* at 96, that the cases it
relies on, including *Kurzawa,* involved 42 USC 1983 claims, but
concludes that "the immunity afforded seems equally available with
regard to other claims," relying on the following dicta in *Kurzawa,
supra,* 732 F2d 1458.

> Notwithstanding their already successful statute of limita-
> tions defense, the other defendants [a psychologist, two psychia-
> trists and a guardian ad litem] would have also been entitled to
> immunity.

The proceedings in *Kurzawa* are somewhat unclear. It appears from
the district court opinion, 545 F Supp 1260 (ED Mich, 1982), that the
plaintiffs brought § 1983 claims against all seven defendants and
additionally brought pendent state claims under the Michigan Handi-
cappers' Civil Rights Act (MHCRA), MCL 37.1101 *et seq.*; MSA
3.550(101) *et seq.*, (against all defendants), and for common law
negligence and malpractice (against two state defendants and three
mental health professionals.) Four defendants, including the three
state defendants, brought motions to dismiss the § 1983 claims on
statute of limitations grounds. The district court held that the minor's
claim was not barred, but dismissed the parents' § 1983 claim against
all defendants on the basis of the statute of limitations. The MHCRA
claim was brought only with respect to the parents and was dismissed
with respect to all the defendants on the basis of the statute of
limitations. The parents' malpractice claim against the five defen-
dants was dismissed as well on statute of limitations grounds, but the
minor's was not. One of the mental health professionals also sought
dismissal of the § 1983 claims on the basis of failure to state a claim.
The court concluded that the plaintiffs' allegations were conclusory
and dismissed the § 1983 claims against all the nonstate defendants
on this basis, thus dismissing the minor's claim as well as the
parents'. The plaintiffs conceded that the state-law claims against one
of the mental health professionals should be dismissed. The court
then dismissed the remaining state-law claims against the private
defendants for lack of pendent jurisdiction, having dismissed the
§ 1983 claims. Later, apparently in an unreported decision, the dis-
trict court dismissed the minor's remaining § 1983 claims on immu-
nity grounds. On appeal, the Court of Appeals stated:

preme Court decision the CAS defendants rely on and the *Kurzawa* court relied on, *Briscoe v LaHue,* 460 US 325; 103 S Ct 1108; 75 L Ed 2d 96 (1983), addressed only immunity in 42 USC 1983 claims.

Moreover, to the extent *Kurzawa* can be understood to grant blanket absolute immunity, it has been criticized in the federal courts, and its approach disapproved of. See *Gardner v Parson,* 874 F2d 131, 145 (CA 3, 1989) (stating with respect to the *Kurzawa* court's holding that guardians ad litem are absolutely immune: "[T]he court did not analyze the precise function of the guardian ad litem . . . and we are hesitant to grant a blanket of absolute immunity to all guardians ad litem in the performance of all their duties."). The *Gardner* court noted that the Courts of Appeal for the First, Fifth, and Ninth Circuits have taken functional approaches in deciding absolute immunity

---

We agree with the district court's determinations regarding the various statutes of limitations and their application to this lawsuit. We also agree that the remaining defendants are entitled to immunity. However, we reach the same result for different reasons. [732 F2d 1458]

The court then discussed *Briscoe v LaHue,* 460 US 325; 103 S Ct 1108; 75 L Ed 2d 96 (1983), *Butz v Economou,* 438 US 478; 98 S Ct 2894; 57 L Ed 2d 895 (1978), and *Imbler v Pachtman,* 424 US 409; 96 S Ct 984; 47 L Ed 2d 128 (1976), and concluded "that the defendants are entitled to absolute immunity. The remaining defendants are state employees who are responsible for the prosecution of child neglect and delinquency petitions in the Michigan courts." *Id.* The "remaining defendants" refers to the state defendants for whom the minor's § 1983 claims were not dismissed for failure to state a claim, and for whom the parents' § 1983 and state claims were dismissed on the basis of the statute of limitations. The court went on to state, in dicta, that the other defendants, who had already prevailed on different grounds, would also be entitled to immunity under *Briscoe.*

It is not at all clear that the dicta at issue addressed the plaintiffs' state-law claims in addition to their § 1983 claims. Moreover, the dicta relies on *Briscoe,* which was also a § 1983 case and advanced the functional approach toward absolute immunity analysis. That approach is discussed *infra* and, when applied to the facts presented here, militates against extending absolute immunity to the CAS defendants.

questions, focusing on the specific challenged conduct and not granting blanket immunity.

In cases decided after *Kurzawa,* the United States Supreme Court has utilized the functional approach in addressing questions of absolute immunity in 42 USC 1983 cases and has noted that "[w]e have been 'quite sparing' in our recognition of absolute immunity . . . and have refused to extend it any 'further than its justification would warrant.' " *Burns v Reed,* 500 US 478, 487; 111 S Ct 1934; 114 L Ed 2d 547 (1991). See also *Buckley v Fitzsimmons,* 509 US 259, 269-271; 113 S Ct 2606; 125 L Ed 2d 209 (1993).

The Court of Appeals for the Sixth Circuit in *Achterhof v Selvaggio,* 886 F2d 826, 830 (CA 6, 1989), held that no absolute immunity was available to a DSS social worker who opened a child abuse case, investigated it, and placed a parent's name in the DSS' central registry of abuse and neglect, because these were administrative or investigatory functions, and not prosecutorial or judicial functions or otherwise intimately related to the judicial process. In *Snell v Tunnell,* 920 F2d 673, 689 (CA 10, 1990), the Court of Appeals for the Tenth Circuit affirmed the denial of absolute immunity to governmental employee social workers and supervisors, noting that "[w]hen the activity of a social worker is not integral to the judicial process, absolute immunity is not warranted." The plaintiffs had alleged that the social worker defendants were liable under 42 USC 1983 for activities occurring during the investigation of their foster home. *Id.* at 676-677. In *Spielman v Hildebrand,* 873 F2d 1377, 1383 (CA 10, 1989), the court held that nontestimonial actions by social workers, including their decision to remove a foster child without affording the plaintiffs an agency hearing, were not integral to the judicial process and that

the social workers were not entitled to absolute
immunity for those actions. Similarly, in the in-
stant case, plaintiffs' allegations included acts that
would not be entitled to absolute immunity under
these cases.

C

I also find no merit in arguments of the CAS
defendants that they are entitled to quasi-judicial
derivative immunity on the basis that they were
simply following the probate court's orders and
that they were entitled to summary disposition on
the basis of this Court's order remanding defen-
dant Schornstein's motion for summary disposition
to the trial court for reconsideration. Plaintiffs
alleged wrongful acts that did not involve execu-
tion of the court's order, and the actions of the CAS
defendants extended beyond providing testimony,
reports, and recommendations to the probate
court. See *Snell, supra,* 920 F2d 693, n 19. Further,
unlike Schornstein, defendants are not governmen-
tal actors. Additionally, the CAS defendants have
not shown that there is a common-law counterpart
historically accorded to social workers, as required
by *Butz, supra.* See *Antoine v Byers & Anderson,
Inc,* 508 US 429, 432-434; 113 S Ct 2167; 124 L Ed
2d 391 (1993) (holding that a court reporter was
not absolutely immune from suit for failure to
produce a federal criminal trial transcript, because
there was no common-law judicial immunity ac-
corded court reporters and because they are not
integral to the judicial process).[13]

---

[13] Justice Thomas' dissent in a recent denial of a petition for a writ
of certiorari in *Hoffman v Harris,* 511 US —; 114 S Ct 1631; 128 L Ed
2d 354, 355-356 (1994), noted disapproval of extending absolute immu-
nity to social workers:

The courts that have accorded absolute immunity to social

D

The argument of the CAS defendants that they are entitled to immunity under the Child Protection Law[14] is also rejected because plaintiffs assert bad faith,[15] *Awkerman v Tri-County Orthopedic Group, PC,* 143 Mich App 722, 726-727; 373 NW2d 204 (1985).

III

Plaintiffs next argue the trial court abused its discretion by granting sua sponte summary disposition for the CAS, Stovall, Clayton, Zak, and Travis-Ewing pursuant to MCR 2.116(C)(8) and (10) when no motion for summary disposition was pending. The trial court's opinion and order is entitled "order granting summary disposition under MCR 2.116(C)(8) and (10) and denying leave to amend," although it appears that no motion to amend was before the court. The opinion states in pertinent part:

In their present posture the instant cases claim negligence based upon violation of statute, ordinance or contract. The complaint before the court as of this date does not plead nor [sic] statutory

workers appear to have overlooked the necessary historical inquiry; none has seriously considered whether social workers enjoyed absolute immunity for their official duties in 1871. If they did not, absolute immunity is unavailable to social workers under § 1983.

[14] While the applicability of that law to the instant case is not clear, plaintiffs have not appealed the trial court's decision that the statute applies.

[15] The second amended complaint in the 1988 case (CAS, Stoval, and Clayton) specifically alleges bad faith. While the original complaint and first amended complaint in the 1989 case (Zak and Travis-Ewing) alleged bad faith, the second amended complaint does not use the phrase in relation to these defendants; nonetheless, the specific allegations allege acts that could be seen as constituting bad faith.

ordinary negligence or professional negligence. The complaint was amended three times before the last set of Court of Appeals Orders. It has not been amended since. At a hearing on settlement of jury instructions, the court was posed with the issue of whether the plaintiff could meet its burden of going forward on the claim as pleaded. Upon review and reflection, the court determines that the plaintiff cannot present a statute upon which negligence can be predicted [sic] and did not plead or give notice of non-statutory or professional · negligence. An amendment at this time would severely prejudice the defendant and, therefore, will not be allowed. Therefore, dismissal under MCR 2.116(C)(10) and (8) is *granted.*

* * *·

Plaintiff offered the Child Welfare and Protection Act as the basis of this claim. In this Act under definitions the department is defined as the Department of Social Services. The plaintiff argues that the department control [sic] with C.A.S. made C.A.S. the department for the purposes of duties. If this were true, absent gross negligence, C.A.S. would be cloaked in governmental immunity. Gross negligence wasn't plead [sic]. Further a governmental entity cannot contract away its statutory obligations. C.A.S. is neither named nor described in the subject statute.

Plaintiff has argued that the defendant's [sic] have acknowledged that they had certain duties regarding the preservation of the family unit. Assuming this to be true, this duty either arises out of the D.S.S./C.A.S. contract or out of the standard of care of [sic] profession of social work. Contractual negligence is arguably pleaded and/or is an issue on which sufficient notice to avoid prejudice has been given. However, the Martins were not in privity of contract with the Department of Social Services or C.A.S. [W]ithout privity a claim could only be brought under intended beneficiary theories. The D.S.S./C.A.S. contract was not one where Mr. and Mrs. Martin were intended beneficiaries. If anyone, Ashley was such a person.

However, even she does not qualify as an intended beneficiary under Michigan Law so as to give her standing to enforce the contract.

This leaves us with only professional standards creating the duties allegedly admitted by defendants. At no time was this claim pleaded or noticed. As to plaintiff's [sic] asertion that this case should go forward on ordinary negligence not based on a statute, this claim is, also, rejected. First there is no such pleading. Secondly, this case has proceeded on claims of specific breaches of duties which are imposed, as noted earlier, either by professional standards or contract.

Regrettably, this case is dismissed and the plaintiffs are left with no relief.

The CAS defendants argue that at the numerous summary disposition hearings, and in writing in response to various motions, plaintiffs, although purporting to set forth all claims relied on, never mentioned professional negligence. The CAS defendants' motion in limine, filed on January 10, 1992, stated in pertinent part:

The duties Plaintiffs allege are at paragraphs 22-24 of their Second Amended Complaint. These duties, allegedly flowing from the statute, are not articulated by any statute known to Defendants. Defendants request that the court rule on the legal issue of what duty Plaintiffs were owed under what statute and limit evidence at trial to evidence of breach of those duties only.

At the motion in limine hearing on February 21, 1992, defense counsel again stated that the CAS defendants had no notice of what duties plaintiffs were owed and said "that's what the motion [in limine] points to." The court responded:

That is not what this motion points to. This is not a motion to strike. These [sic] is not a motion

for summary disposition for failure to indicate
what the statute was. We have about five of these,
I assumed after the last amended complaint that
whatever motions were going to be brought under
C-8 indicating that there was a failure to state a
claim was [sic] were going to be brought. They
weren't.

At the end of the hearing, defense counsel stated:

> If I can just make sure I understand, as far as
> the duty issue, we're going to hash that one out in
> the context of Jury instructions during the pre-
> trial conference.
> In response, plaintiff's counsel stated: "That's
> right, Judge."

A pretrial order dated January 13, 1992, speci-
fied that the parties were to submit a joint pretrial
statement by February 26, 1992, including a con-
cise statement of the claims against each party
and the defenses against each claim, noting which
witnesses will actually testify with respect to each
claim and defense, and proposed substantive pre-
trial instructions concerning the claims and defen-
ses as pleaded. The pretrial order stated "failure
to abide by this order may result in default, dis-
missal, striking of answers or defenses . . . ."
Trial was scheduled for April 1, 1992.

Plaintiffs' pretrial statement, entitled "Claims of
the Parties: Plaintiffs' concise statement," stated
that the CAS defendants owed plaintiffs the duty to
gear provision of foster care services toward pre-
serving the Martin family and that the CAS defen-
dants failed to do so in a number of ways.

At the March 24, 1992, pretrial hearing referred
to in the court's opinion and order dismissing
plaintiffs' claims, while discussing the instructions,
the court asked whether the case was one of

"ordinary negligence," to which plaintiffs' counsel answered affirmatively. Counsel then indicated that the duty on which the negligence claim was based arose under § 8 of the Child Protection Act, MCL 722.628; MSA 25.248(8), and the DSS and the CAS policy manuals. Counsel stated as well that the deposition testimony of the various defendants also established their duties. The court found that the statute set forth the DSS' duties, and was not applicable to the CAS, a private agency. The court stated that the case would proceed as an ordinary negligence case and that because defendants brought no motion for summary disposition regarding that issue, the case would proceed on that basis until an appropriate motion at the conclusion of plaintiffs' proofs.

Later during the hearing, in the course of discussing the social workers who would be witnesses at the trial, plaintiffs' counsel indicated one social worker would testify concerning damages and the standard of care for social workers. The trial court said, "This is going to become a social workers' malpractice case," to which plaintiffs' counsel said, "It always have [sic] been," and defense counsel stated, "I do agree with that."

In the course of discussing the jury instruction regarding ordinary care, the trial court stated:

> *The Court*: . . . [Plaintiffs] are not going to get an instruction relative to violation of the statute. Understanding that, which of your [defense] witnesses will speak to whether or not there was a breach of the duty of ordinary care as between the CAS and the Martins?
>
> [*Defense counsel*]: . . . The complaint does not allege ordinary care duties arising from common law. It alleges only a breach of statute.
>
> \* \* \*
>
> *The Court*: Looking at paragraph 23. Defendant

CAS owed plaintiff's [sic] the following duties, and this is a question to the plaintiff, to encourage and support an ongoing relationship, to develop a working relationship, to advise and to reassure, to identify and articulate—this is language from what?

[*Plaintiffs' counsel*]: This is language from [CAS defendant] Andrea Zak's testimony and also the Children's Aid Society placement manual and admission statement.

*The Court*: And how would you characterize paragraph 23? As the duty of what, from who to who?

[*Plaintiffs' counsel*]: Duty of reasonable care that a social worker owed to the natural parents of a child who's receiving foster care.

*The Court*: So you're saying this is not a common law duty. This is, in essence, a breach of—

[*Defense counsel*]: Of the proceeding [sic] paragraph says that the duty falls out of the statute.

*The Court*: I understand that, sir.

Counsels, why isn't that a claim filed under 3.001 [sic, 30.01], professional negligence. Nobody's asked for [30.01]. . . . If, in fact, this is a duty imposed upon a professional, then it has to be imposed upon a professional based upon the standard of care, and a pleading of that, by the way, which we never had.

Plaintiffs' counsel conceded that given the court's ruling that the statute did not apply, the instruction suggested by the court would be more appropriate. The court then questioned counsel concerning whether his pleadings gave notice of a professional malpractice claim. Counsel argued that the pleadings could be read to include professional negligence in the specific allegations of duty in paragraph 23 and breach in paragraph 24. However, the court was not convinced that the pleadings provided defendants with sufficient notice that the alleged duties arose out of defendants'

professional capacities and indicated that though
it was leaning toward entering an order of dis-
missal, it would consider the issue for a week:

> I'm going to chew on these. *What I suspect is
> I'm going to enter an order for dismissal.* I'm going
> to chew on it for a week. That's all I can do.
>
> I am concerned that we have a pleading that
> doesn't speak to a claim of professional negligence,
> that, I am not comfortable has given the defendant
> [sic] notice that they are to prove or to address
> proofs relative to whether they met the standard
> of care attributable to social workers within their
> field of expertise, whichever field of expertise of
> social work that may be. So I'll think about it.
>
> [*Plaintiffs' counsel*]: May I look at your Jury
> instructions one moment, please?
>
> *The Court*: I'm closing the record. You can look
> at anything you want. [Emphasis added.]

The CAS defendants had not moved for summary
disposition for failure to state a claim, had not
moved to strike, and had not moved for a more
definite statement. Conversely, plaintiffs' counsel
made no objections at this final hearing, did not
request an opportunity to amend, and filed no
motions or briefs before the court issued its opin-
ion and order, not a week later, but on April 24,
1992. Nonetheless, I believe summary disposition
was improper.

The trial court found that defendants would be
prejudiced by a professional negligence claim be-
cause of the absence of notice, although defense
counsel at the pretrial hearing indicated that the
case had been a professional malpractice case.[16]

---

[16] Further, plaintiffs had made reference to the issue of non-statu-
tory professional negligence in their response to a motion for sum-
mary disposition filed by the CAS, Stoval, and Clayton, dated June 20,
1989:

Further, plaintiffs argue that the CAS defendants had notice of the professional negligence claim as a result of discovery responses that indicated plaintiffs' intent to elicit expert testimony regarding appropriate social work techniques and as a result of depositions that also focused on standards applicable to foster care workers.

Under the circumstances, I conclude the trial court erred in foreclosing pursuit of the professional negligence claim on the basis that it was not pleaded and that amendment of the complaint would be unduly prejudicial.

Plaintiffs' Complaint includes a common-law negligence claim. Defendant CAS and its employees owed Plaintiff Martin a duty of care (or a third-person duty; *Bolton v Jones (On Remand)*, 173 Mich App 725 [434 NW2d 415] (1988) to perform their functions as social workers so as to serve the goal of attempting to reunite the family. *Accord In re Bedwell*, 160 Mich App 168, 173 [408 NW2d 465] (1987).

Additionally, there was discussion of the CAS defendants' exercise of professional judgment at a motion in limine hearing on February 21, 1992, while discussing other issues:

*The Court:* . . . [T]he interaction between the Martins and the individual defendants is going to be before the Court. And some of the conversation between the Martins and the individual—in fact, significant amounts of the conversation had to do with Chidren's Aid folks saying you must do X, Y and Z including the admission of responsibility, and the parents saying, no, we will do X or Y. We will not admit responsibility.

Your clients, then, *applied their professional judgment one way or another with or without malice or negligence, who knows if you can prove that, but they applied their professional judgment to the situation and continued in their interaction with the Court* relative to the issue of the permanency plan for Ashley. How do we keep the Jury from knowing anything, if that's what you want, about the Martins' perception that they are not responsible?

[*Defense counsel*]: . . . In the [proposed] order I specifically limit the types of evidence—set forth the types of evidence I seek to limit. One thing the Court stated just now I think needs to be responded to.

*We didn't apply our professional judgment on the issue of abuse. That was applied by the Court.*

*The Court: But you applied your professional judgment to the creation of and the monitoring of the plan.* [Emphasis added.]

I would affirm the trial court's dismissal of the DSS defendants on qualified immunity grounds, vacate the order dismissing the CAS defendants, except Stoval, and remand for further proceedings.