*In re* MARTIN

Docket No. 99929. Submitted March 17, 1988, at Detroit. Decided April 5, 1988.

Ashley Lynn Martin, a minor, was made a temporary ward of the Wayne County Probate Court and was placed in foster care following a jury trial. Her parents, Cynthia and Michael Martin, moved for a new trial on the basis of newly discovered evidence. The court, Paul R. Mahinske, J., denied the motion. The Martins appealed and the Wayne Circuit Court ordered a statutory rehearing. The probate court held the hearing but declined to reconsider the issue of the cause of the minor's injuries, an issue resolved at the adjudicative hearing. The Martins claimed an appeal of the denial of the motion for a new trial and filed an application for superintending control or habeas corpus in the Court of Appeals. The Court of Appeals dismissed the claim of appeal. The Martins sought leave to appeal in the Supreme Court, which, in lieu of granting leave to appeal, remanded to the Court of Appeals for plenary consideration as on leave granted, 429 Mich 852 (1987).

The Court of Appeals *held:*

1. The petition filed with the probate court asking it to assume jurisdiction over Ashley was not defective on its face. It alleged that the respondents neglected or refused to provide Ashley with a fit home environment, resulting in her receiving numerous injuries. The petition need not disprove every possible innocent explanation for the injuries. The allegations were sufficient to place respondents on notice of the basis for the requested court intervention.

2. Respondents waived the right to claim instructional error

REFERENCES

Am Jur 2d, Constitutional Law § 804; Parent and Child §§ 34, 35; Trial §§ 906, 909, 913, 918.

Validity and construction of penal statute prohibiting child abuse. 1 ALR4th 38.

Physical abuse of child by parent as ground for termination of parent's right to child. 53 ALR3d 605.

See also the annotations in the Index to Annotations under Instructions to Jury.

by expressing satisfaction with the instructions when they were given.

3. The standard of proof required at the adjudicative hearing, proof by a preponderance of the evidence, did not deny respondents due process of law.

4. The original jury verdict was not clearly erroneous.

5. The court abused its discretion in ordering that Ashley remain in foster care instead of being returned to her parents. The evidence in favor of returning her to her parents was compelling.

6. Neither superintending control nor habeas corpus was necessary or appropriate in light of the disposition of the case.

Affirmed in part, reversed in part and remanded with instructions.

1. PARENT AND CHILD — CHILD NEGLECT — PLEADING.
A petition alleging injuries to a child as evidence of child neglect or abuse need not disprove every possible innocent explanation for the injuries.

2. APPEAL — JURY INSTRUCTIONS — WAIVER.
A party waives the right to claim as error on appeal jury instructions with which he indicated satisfaction when they were given.

3. PARENT AND CHILD — CHILD NEGLECT — ADJUDICATIVE HEARING — BURDEN OF PROOF — DUE PROCESS.
The standard of proof required at an adjudicative hearing on a child neglect or abuse petition, proof by a preponderance of the evidence, does not violate the respondent's right to due process of the law.

4. CONSTITUTIONAL LAW — DUE PROCESS — STANDARD OF PROOF.
The particular standard of proof required by due process is dependent on three factors: (1) the private interest affected by the proceedings; (2) the risk of error created by the state's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure.

5. PARENT AND CHILD — CHILD NEGLECT — APPEAL.
The Court of Appeals has the power to review the evidence forming the basis for dispositional orders in neglect and abuse cases (MCL 600.861; MSA 27A.861).

*Richard Seid,* for Cynthia and Michael Martin.

*John D. O'Hair,* Prosecuting Attorney, *Timothy*

*A. Baughman,* Chief, Appeals, and *Thomas M. Chambers,* Assistant Prosecuting Attorney, for The Department of Social Services.

Before: WAHLS, P.J., and R. M. MAHER and G. S. ALLEN,* JJ.

R. M. MAHER, J. This case is before us on remand from the Supreme Court for plenary consideration, pursuant to MCL 600.861(c)(i); MSA 27A.861(c)(i) and MCR 7.203(A)(2), as though on leave granted. *In re Martin,* 429 Mich 852 (1987). Respondents challenge a jury's determination that their daughter, Ashley Lynn Martin (born September 6, 1984), came within the jurisdiction of the Wayne County Probate Court by reason of abuse. They also challenge the court's continued placement of the child in foster care. We affirm in part and reverse in part.

For purposes of this appeal, it is unnecessary to set forth in great detail the extensive evidence, both testimonial and documentary, which was presented at the numerous lower court proceedings. However, some depth of discussion is required in order to understand fully the issues presented herein.

The state's involvement with this case began on December 18, 1984, when Ashley was only thirteen weeks old. On that date, respondents took the child to an emergency pediatric clinic because she was acting listless and had a high temperature. After the doctor performed blood tests and took several x-rays, it was discovered that Ashley had pneumonia, numerous broken ribs (possibly as many as eighteen) in various stages of healing, fractures of both femurs, a bruise on the lower

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

back, and a bruise on the left leg. Suspecting abuse, the doctor transferred Ashley to a hospital and contacted the Wayne County Department of Social Services (DSS), which immediately filed an emergency petition with the Wayne County Probate Court for a temporary detaining order. The order was issued.

Shortly thereafter, the DSS filed another petition with the court, this one requesting that Ashley be made a temporary ward of the court. MCL 712A.2(b); MSA 27.3178(598.2)(b). Respondents requested a jury trial on the petition.

Trial was originally scheduled for August 16, 1985, but was adjourned until January 13, 1986, by mutual agreement of the parties. Respondents wanted the extra time to have Ashley examined at the Shriner's Hospital in Chicago to determine if there was a medical explanation for her injuries, such as osteogenesis imperfecta (OI, also known colloquially as brittle bone disease).

Petitioner's witnesses at trial included four physicians, each of whom examined Ashley and opined (although with varying degrees of certainty) that her injuries were the result of abuse. They ruled out OI as a possible cause because Ashley did not have many of the abnormalities associated with that disease (e.g., narrow bones, thin skin, fractures at weight-bearing points, excessive wormian bones in the skull). Other witnesses testified that since being placed in foster care Ashley has had no new fractures and is a normal, healthy baby.

Respondents presented evidence that Ashley may have had some medical disorder that made her susceptible to bone fractures. Particularly, Dr. Colin Paterson, a professor at the University of Dundee in Scotland and an expert in biochemical medicine and bone disorders, testified that he was confident there was a mistaken diagnosis of abuse.

He felt Ashley had some bone disorder, possibly copper deficiency, but he could not pinpoint the exact cause because the proper tests were not performed early enough. A clinical psychologist and a psychotherapist, both of whom tested and evaluated respondents at length, testified that respondents did not exhibit those characteristics typical of child abusers. Respondents testified that Ashley would cry whenever she was picked up, held, or had her diaper changed. They called the pediatrician about this numerous times (which the pediatrician confirmed at trial) but were repeatedly assured that Ashley was just fussy. Ashley cried so violently that on one occasion she ruptured a blood vessel in her eye. On another occasion the underside of her tongue bled. Respondents contacted the pediatrician after each of these episodes but were again told that Ashley was just fussy. On hindsight, respondents believe Ashley was crying out of pain because of broken bones inflicted during normal handling of the child. They continued to maintain their innocence of any wrongdoing.

At the conclusion of proofs, the jury found that petitioner had proven by a preponderance of the evidence that Ashley had been abused and that she should be made a temporary ward of the court. Subsequently, respondents moved for, but were denied, judgment notwithstanding the verdict or a new trial.

A dispositional hearing was held on February 24 and 25, 1986, to determine whether Ashley should continue in foster care or be returned to respondents' home under DSS supervision. Petitioner asserted that a potential for reabuse existed unless and until respondents admitted responsibility for Ashley's injuries. Respondents continued to profess their innocence of any wrongdoing. After hearing the evidence presented by both sides, the court

ruled that Ashley should remain in foster care. Respondents appealed that ruling to this Court.[1]

Statutory rehearings were held in August of 1986 and March of 1987. At the conclusion of each, the court ordered that Ashley shall continue in foster care, although regular visitation was permitted. Respondents were directed to undergo counseling and attend parenting classes.

At the March, 1987, hearing, respondents argued a motion for new trial based on newly discovered evidence. The new evidence was an affidavit from Dr. Paterson, whose credentials were mentioned previously, and a report from Dr. A. M. Parfitt, Director of the Bone and Mineral Research Laboratory at Henry Ford Hospital. Dr. Paterson concluded, after reviewing all the medical tests, with "virtual certainty" that Ashley's injuries resulted from a copper deficiency. Dr. Parfitt also diagnosed the cause as copper deficiency or some other metabolic disorder having similar effects.

The court denied the new trial motion, stating that it did not believe the report and affidavit constituted newly discovered evidence. It also refused to allow respondents to present the testimony of Dr. Parfitt, who accompanied them to the hearing, although respondents were permitted to place on the record the substance of Dr. Parfitt's findings. The court continued the prior orders imposed in the case and scheduled a rehearing in six months. Respondents appealed the denial of its motion to the Wayne Circuit Court.

In June of 1987, the Wayne Circuit Court heard

---

[1] When this case was first appealed to this Court, it was erroneously dismissed as premature. That dismissal was then appealed to our Supreme Court, where both parties and the Court agreed that MCL 600.861(c)(i); MSA 27A.861(c)(i), as amended by 1982 PA 318, vested respondents with an appeal of right in cases such as this. Therefore, the case was remanded back to us for plenary consideration, as though on leave granted.

the appeal and ordered the probate court to conduct a proper statutory rehearing within twenty-one days. For some unexplained reason, the rehearing did not occur until October 6, 1987—and then only at the prompting of a show cause order to the probate court.

At the rehearing, two additional reports were submitted into evidence. The first was from Dr. Elizabeth Seagull, a professor of pediatric psychology at Michigan State University, who, after defining the issues in dispute and reviewing the evidence, recommended that Ashley be slowly integrated back into respondents' home and that she maintain contact with her foster family. (The entirety of Dr. Seagull's report is set forth *infra*.)

Also, at the rehearing, the court received a report from Dr. Coy Denton Sims, a Ph.D. in pediatric-child-school and family therapy, which indicated that continued placement of Ashley in foster care could cause irreparable psychological and emotional damage to the child. Dr. Sims also noted that respondents have attended three separate parenting seminars (receiving certificates of honor from two) and have undergone nearly three years of evaluations and psychotherapy. He felt there would be no risk in returning Ashley to respondents' care.

At the conclusion of the rehearing, the court stated that it would not reconsider the issue of what caused Ashley's injuries because that was resolved at the adjudicative hearing. It also stated that the rigid positions of both parties kept the case at a stalemate. The court, in an attempt to resolve the case, ordered Ashley's attorney to locate a neutral therapist to immediately implement an observational treatment situation between respondents and Ashley. A status report was due by

January 13, 1988. Ashley was to remain in foster care during the interim.

At the January 13, 1988, rehearing, Ashley's attorney stated that she was still attempting to locate a neutral therapist who would be agreeable to all parties. The court allowed her additional time to find such a person. Also at the rehearing, the court heard testimony from David Allasio, a foster care worker newly assigned to the case. Allasio stated that he recommended allowing respondents to assume greater responsibility for the parenting and supervision of Ashley, although he did not recommend returning the child to the home outright at this time. He also testified that Ashley has recently become more anxious and aggressive, and has begun having frequent nightmares. Finally, Allasio stated that he has not insisted that respondents admit to having abused Ashley. At the conclusion of the hearing, the court ordered that Ashley remain in foster care and scheduled another rehearing for July 11, 1988.

During the past couple of months, respondents have apparently enjoyed greater visitation with Ashley. No longer are visits restricted to a foster care setting, but have included trips to shopping malls and Belle Isle. The visits have gone well and respondents have received favorable comments. Also during the interim, a therapist from the University of Michigan was selected to observe respondents' interaction with Ashley. Although that observation has not yet taken place, it is scheduled for the very near future.

This is where the case stands today: more than three years after Ashley was removed from respondents' custody and placed in foster care, the case is only slightly closer to resolution than when the state first became involved. It is a sad commentary that Ashley continues to languish in a

system which, although pure of motive and purpose, only increases the possibility that the child will suffer irreparable psychological and emotional damage. Indeed, the damage has seemingly begun to manifest itself. Lest such harm become irreparable, it is time for effective action, which we will expound upon forthwith. First, we must address the specific issues raised on appeal.

We first find that the petition filed with the probate court requesting it to assume jurisdiction over Ashley was not defective on its face. The petition alleged:

> Parents, neglect, refuse or are unable to provide a home environment which is fit for said child by reason of the following conditions:
>
> a) On or about December 15, 1984 Ashley was admitted to St. John's Hospital for treatment of a fever and diarrhea. The child was observed at the hospital to have multiple contusions on his [sic] back and left leg. X-rays revealed that the child had approximately eighteen (18) rib fractures in various stages of healing.
>
> b) The parents were unable or unwilling, to provide an explanation for the child's injuries which is consistent with medical history. The mother denied any recent trauma to the child. Parents claimed that the ribs were fractured at time of child's birth and injuries were further complicated with rough handling by the father. [sic] contrary to MCLA 712A.2(b).

Those allegations were sufficient to place respondents on notice of the basis for the requested court intervention. See *In re Harmon,* 140 Mich App 479, 481; 364 NW2d 354 (1985). Cf. *In re Kurzawa,* 95 Mich App 346, 353-356; 290 NW2d 431 (1980). The petition alleged that respondents neglected or refused to provide Ashley with a fit home environment which resulted in the child's receiving nu-

merous injuries. It could not be any more fact-specific as to the cause of the injuries for the simple reason that that information was unknown at the time. Although the injuries were also consistent with a medical disorder, there is no requirement that the petition disprove every possible innocent explanation for the injuries. See MCL 712A.11; MSA 27.3178(598.11) and MCR 5.904(A)(1). The petition sufficiently alleged acts constituting abuse or neglect within the meaning of MCL 712A.2(b); MSA 27.3178(598.2)(b).

We also find that the alleged instructional errors asserted by respondents were not improper. After the court had completed its jury charge, all the parties—respondents included—indicated satisfaction with the instructions. Therefore, respondents have waived the right to claim error on appeal. MCR 2.516(C); *Moskalik v Dunn,* 392 Mich 583, 592; 221 NW2d 313 (1974); *Temborius v Slatkin,* 157 Mich App 587, 602; 403 NW2d 821 (1986). In any event, we find that the instructions, when read as a whole, adequately apprised the jury of the controlling law. Respondents suffered no manifest injustice thereby. *Green v Evans,* 156 Mich App 145, 158; 401 NW2d 250 (1985).

We next hold that the standard of proof required at adjudicative hearings, i.e., by a preponderance of the evidence, does not violate respondents' rights to due process of the law. The particular standard of proof required by due process is dependent on three factors: (1) the private interest affected by the proceedings; (2) the risk of error created by the state's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *Santosky v Kramer,* 455 US 745, 754; 102 S Ct 1388; 71 L Ed 2d 599 (1982) (citing *Mathews v Eldridge,* 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 [1976]).

In *In re Riffe,* 147 Mich App 658, 669-670; 382 NW2d 842 (1985), lv den 424 Mich 904 (1986), this Court recognized that the "preponderance of the evidence" standard applies to adjudicative hearings while the "clear and convincing" standard applies to termination proceedings. However, *Riffe* did not address the constitutional issue presented herein. Other jurisdictions which have addressed the question have held that the "preponderance" standard satisfies the constitutional guarantees in cases where the court is merely assuming jurisdiction over the child and not terminating the parent's rights in that child. See, e.g., *In re Orzo,* 84 Misc 2d 482, 490-493; 374 NYS2d 554 (1975); *In re S,* 66 Misc 2d 683, 687-689; 322 NYS2d 170 (1971). We agree with the analysis and conclusions of those New York cases. We would simply note that in proceedings to determine jurisdiction over a child—as opposed to proceedings to terminate parental rights—the private interest at stake is not as great while the state's interest in using the challenged procedure is heightened. Moreover, since the parents are allowed to fully present their case to a jury of their peers, the risk of error is minimal. *Santosky, supra.*

We decline to adopt a higher standard of proof, as respondents urge, in cases where the child remains in foster care for a lengthy period of time. Such a rule would be unworkable in practice. At what point should the standard be raised? A per se rule (e.g., two years) would, of course, ignore the needs of a particular case. A flexible rule (e.g., time to be determined by the trial court) would, in effect, require the parties and the court to relitigate the jurisdictional petition. Since this procedure is not authorized by court rule or statute, we would be overstepping our appellate function to

adopt such a rule. Any relief in this regard should come from our Supreme Court or the Legislature.

We also point out that increasing the standard of proof would not, as respondents believe, work to their benefit. In *Santosky,* the United States Supreme Court held that parental rights may be terminated upon a showing of clear and convincing evidence. That holding was expressed by this Court in *In re LaFlure,* 48 Mich App 377, 385; 210 NW2d 482 (1973), lv den 390 Mich 814 (1973). If, after a lengthy period of court jurisdiction, a parent requests a rehearing under the higher standard, undoubtedly the state would respond by filing a termination petition since the required proof would be the same. We do not mean to imply bad faith on the part of the state. Rather, the state may believe the child should not be returned to the parent and may feel pressured into taking action to prevent return. The state (and, incidently, the child) should not be penalized by delaying a request for termination because of the hope that someday the child can be returned, although the parent is not yet ready. The position advocated by respondents would not, on closer examination, grant them the relief requested or work to the benefit of parents in general.

The final issue raised by respondents concerns the continued placement of Ashley in foster care. Actually, respondents raise several questions in this issue, the first of which is whether, in retrospect, it can be determined that the jury verdict was against the great weight of the evidence. Although substantial evidence has been submitted subsequent to the adjudicative hearing that Ashley's injuries were the result of a medical disorder, it must be remembered that several doctors testifying on behalf of petitioner opined that the injuries were caused by abuse, not a medical disorder.

Respondents have not presented evidence which clearly refutes the findings of those witnesses. Hence, there exists the possibility that the injuries were inflicted by human element. Even with the benefit of hindsight, we cannot say that the jury's verdict was clearly erroneous and that the court should not retain jurisdiction over Ashley.

The second question raised by respondents, although somewhat confusing in its expression, is whether the probate court abused its discretion in ordering Ashley to remain in foster care instead of being returned to respondents' home. After careful consideration of the proofs, we find that it did. We should preface that finding, though, by explaining that our decision is made only reluctantly, and with great caution, because, as an appellate court, we are ill-suited for deciding the disposition of children within the probate court's jurisdiction. However, we would be shirking our appellate responsibilities, pursuant to MCL 600.861(c)(i); MSA 27A.861(c)(i), if we were to merely rubber-stamp a probate court's decision,[2] especially where—as here —the proofs concerning the well-being of the child are so compelling in favor of immediate return to the parents.

---

[2] In *In re Adrianson,* 105 Mich App 300, 311; 306 NW2d 487 (1981), this Court held:

> We conclude that this Court has jurisdiction to examine the 1977 petition to determine only whether it alleged sufficient facts that would allow jurisdiction to attach in the probate court. This limited inquiry, which is not being made in a direct appeal, must not consider the evidence that was introduced at the hearing on the petition and which formed the basis of the probate court's disposition of the matter

Subsequent to that decision, MCL 600.861; MSA 27A.861 was amended to allow an appeal of right as to "[a]n order of disposition placing a child under the supervision of the court or removing the child from his or her home." Thus, we now have the power to review dispositional orders like the one herein. Concomitantly, we must have the power to review the evidence which formed the basis of such orders.

Although our decision is based on a careful review of the entire record, we will point out that evidence which is most persuasive. Perhaps the most influential is the report of Dr. Seagull, the pediatric psychologist, which was submitted at the statutory rehearing held in October of 1987. Because of the enlightening nature of that report we will quote it at length:

1. A major issue in this case is whether Ashley's medical condition at the time of the original report to Children's Protective Services was due to child abuse or to copper deficiency. The full report from Dr. Paterson and confirmatory evidence from Dr. Parfitt were not available to the jury which heard the case in January of 1986. These reports are sufficiently convincing as to throw doubt on the original diagnosis of child abuse, which was made on the basis of the finding of multiple fractures in different stages of healing.

2. A second major issue in the case has been the continuing demand by professionals that the Martins accept responsibility for Ashley's fractures. There has been an assumption that the Martins' failure to confess guilt means that Ashley cannot be safe in their home, even for a trial period, such as overnight or on weekend visitations.

These two issues have interacted to keep any progress from occurring in reuniting this family. If, in fact, the Martins were not responsible for the injuries to their daughter, Ashley, but the injuries, rather, were the result of copper deficiency, the demand that the parents accept responsibility of the injuries makes no sense. Furthermore, although acceptance of responsibility by the perpetrator is often a treatment goal in child protection cases, particularly cases of incest, it is not unknown for children to be returned to their natural families even when a specific perpetrator has not been identified. Gradual return of children in cases where there is no criminal prosecution is the general practice, not the exception, with close

medical monitoring to insure that reinjury does not occur.

3. It is obvious that Ashley must be returned to the custody of her natural parents forthwith. If we can rely upon the expert opinions of Drs. Paterson and Parfitt, as we must, it appears that this child was never abused. That honest mistakes were made in the well-meaning attempt to protect Ashley does not alleviate the tragedy of the situation.

4. In this particular case, the inordinate and unusual length of time which Ashley has remained in continuous foster care without extended visits in her parents' home makes reunion more problematic. Ashley is undoubtedly confused as to what her relationship is to each set of parents (natural and foster). Mr. and Mrs. Martin have been deprived of the opportunity to form a normal relationship with their daughter during her first three years of development. They will not feel as confident or knowledgable, initially, as parents of a three-year-old who have spent three years with their child. At times they will feel awkward and confused. All three of them will require psychotherapeutic help which is family-oriented and provided by a competent professional whom they can view as an ally and source of support, not another person to "watch" them.

5. Medical monitoring of Ashley should be done by a different person, preferably a competent pediatrician.

6. Because Ashley is attached to her foster parents, the relationship with them should be gradually lessened, rather than severed suddenly and completely. When Ashley is returned to her parents, they should allow her to speak fondly of her "other" family, to speak to them on the telephone and to have visits with them, assuming that relationships between the two families can be conducted in a cordial way. The foster family can serve as a surrogate extended family, like cousins, especially initially.

A continuing relationship with Ashley's foster family will undoubtedly be a painful reminder to

the Martins of all they have been through. Knowing that it is in Ashley's best interest, however, they will surely be willing to bear some further pain for her sake. Likewise, it will be difficult for attached foster parents to give Ashley up, especially as they have believed her to have been abused by her parents. Like the Martins, however, they, too, can show their true caring for this child by not abusing the privilege of some limited continuing contact with her. Knowing it is in Ashley's best interest, they will encourage her attachment to her own parents.

7. The timing of the contacts between Ashley and her foster family in terms of frequency, duration, and gradual cessation should be monitored by the Martin family's therapist, based upon observation of Ashley's responses. As she grows more comfortable with her own parents, seeing her foster parents and siblings may become a confusing or upsetting experience, instead of being like a pleasant visit with old friends or distant cousins. When this happens, or if she simply loses interest in seeing them, contacts should be discontinued.

In addition, the court received a report from Dr. Sims which made the following pertinent findings:

Cynthia and Michael Martin have attended three parenting seminars and obtained certificates with honor from two of them. They have gone through nearly three years of evaluations and psychotherapy to gain insight into their own personal behavior, change their attitude and actions, learn how to deal with stressful situations and to deal with their anger.

. . . They could not have done more to regain the right to have their child Ashley.

. . . [T]he Martins demonstrate a comitment [sic] to their child and an involvement with her which is a strong indication of mental health and stability. Despite the awful pain of the separation, they continue to desparatly [sic] want their child returned.

In summary, Dr. Sims stated: "[I]t is my professional opinion that there is no risk in returning Ashley Martin to her natural parents, Cynthia and Michael Martin."

Following are more examples of the evidence presented which favors return of Ashley to respondents' care. Eric Ryberg, a clinical social worker and psychotherapist, wrote in a July 2, 1985, letter to the court:

> I would conclude from my clinical contact thus far that the Martins are "normal" parents and do not fit the pattern of the abusive parent. . . .
>
> I see no psychiatric reason why the Martins should not regain custody of their child.

That finding was reiterated by Ryberg at the adjudicative hearing as well as the dispositional hearing in February of 1986. Patrick Ryan, a clinical psychologist, testified at the adjudicative hearing that "there's an extremely low probability that they [respondents] abused anybody or a child." He also stated that there is no psychological reason to believe Ashley would be abused by her parents.

Since the adjudicative hearing, petitioner has presented no evidence, except for the fact of Ashley's injuries, that respondents were, or could be, abusive to the child. While the injuries themselves might be a strong indicia of abuse where no legitimate explanation exists for their infliction, such is not the case here. Very persuasive evidence from Dr. Paterson and Dr. Parfitt show that the cause was copper deficiency or some similar metabolic disorder. Although, as we have previously stated, enough contrary testimony exists for affirming the probate court's jurisdiction over Ashley, that evidence certainly defeats petitioner's past insistence

that respondents admit responsibility for the abuse before it would consider returning the child. Such rigidity has no place in our child welfare system. As stated in the report by Dr. Sims: "A life sentence (or three years) for Ashley appears beyond the purpose of the Department of Social Services or the intent of the court."

For the foregoing reasons, we find that the probate court abused its discretion in continuing Ashley's placement in foster care and in not returning her to respondents' custody. However, because of the length of time the child has been away from her parents, we recognize—as did Dr. Seagull—that she will have to be slowly integrated back into respondents' home. Toward that purpose then, we remand the case back to the probate court with directions to conduct a hearing, with all parties participating, within thirty days or less of the issuance of this opinion to determine how best to implement this procedure. The court is to render a decision within ten days thereafter detailing the procedure by which Ashley is to be returned to respondents' care. If any of the parties are aggrieved with the court's plan, we will permit the parties to file briefs only, outlining their respective positions, within twenty-one days.

On remand, a plan for integration is the sole issue to be decided. And, it is the sole issue for which we retain jurisdiction in the case. If neither party files a brief within the allotted twenty-one day period, our jurisdiction will automatically expire without further order.

Because of our disposition of this case, it is neither necessary nor appropriate that we exercise superintending control or issue a writ of habeas corpus to obtain the requested relief. MCR 3.302(B)

and (D)(2); MCR 3.303; *In re People v Burton,* 429 Mich 133; 413 NW2d 413 (1987); *Harmsen v Fizzell,* 351 Mich 86, 93; 87 NW2d 161 (1957).

The order of the probate court assuming jurisdiction over Ashley is affirmed; the order continuing her placement in foster care is reversed and the matter is remanded for further proceedings in accordance with this opinion.