*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN.

# COURT OF APPEALS

*In re* TURNBULL/GILDE, Minors.

UNPUBLISHED
January 13, 2025
10:02 AM

No. 371221
Wexford Circuit Court
Family Division
LC No. 24-031456-NA

Before: PATEL, P.J., and MURRAY and YATES, JJ.

PER CURIAM.

Respondent-mother appeals of right the order removing three of her children, ZT, SG, and WG, from her custody and care. On appeal, respondent-mother argues that the trial court failed to make all the required factual findings prescribed by MCL 712A.13a(9) and MCR 3.965(C) before removing the children from her care. Additionally, respondent-mother contends that removal was contrary to the children's welfare because they were at no substantial risk of harm. We affirm.

## I. FACTUAL BACKGROUND

On March 15, 2024, Children's Protective Services (CPS) visited the home of Daniel Baker after receiving a complaint that Baker was not adequately feeding his three children.[1] Respondent-mother was staying with Baker at that time, but she later moved in along with her three youngest children, ZT, SG, and WG.[2] While respondent-mother was at work, those children were left in the care of Baker.

---

[1] Baker was investigated for the allegations of malnutrition of his three children, but those children were not removed and a petition was not filed.

[2] The initial petition included respondent-mother's oldest child, DT, who was living with his father, James Turnbull, but DT was dismissed from the petition. Thus, this appeal involves only the three youngest children of respondent-mother.

On April 10, 2024, then-one-year-old SG had allegedly fallen out of a booster seat that was strapped to a kitchen chair while in Baker's care. When respondent-mother learned of the fall, she took SG to the emergency room at Kalkaska Memorial Hospital for evaluation. SG was reportedly diagnosed with an ear infection and returned home. Two days later, respondent-mother reportedly took SG to Traverse City Hospital because SG was violently vomiting. There, SG was diagnosed with influenza B, and respondent-mother was told to have SG reexamined by her primary doctor in one to three days.

On April 16, 2024, SG was discovered unresponsive in her crib, so she was transported to Kalkaska Memorial Hospital and diagnosed with a brain bleed. But after a transfer to Helen DeVos Children's Hospital, SG was diagnosed with bilateral subdural brain hemorrhages of various ages and states of healing that were indicative of nonaccidental head trauma that had not occurred from a single, isolated fall. Additionally, SG was severely malnourished. Based on the nature of SG's injuries, WG was also medically examined and diagnosed with brain bleeding and fractured ribs.

On May 3, 2024, the Department of Health and Human Services (DHHS) filed a petition, and the trial court issued an ex parte order removing ZT (age 7 years), SG (age 1½ years), and WG (age 4 months) from the custody and care of respondent-mother and respondent-father.[3] SG and WG were placed in licensed foster care, and ZT was released to the custody and care of his father, James Turnbull. Then, after a preliminary hearing, the trial court authorized the petition, upheld the order of removal, and granted respondent-mother supervised visitation. This appeal followed.

## II. LEGAL ANALYSIS

Respondent-mother argues that the trial court clearly erred in deciding, by a preponderance of the evidence, to enter a preliminary order pursuant to MCL 712A.13a(9) and MCR 3.965(C)(2) temporarily removing respondent-mother's three children from her custody and care. This Court reviews a trial court's findings of fact for clear error. *In re LaFrance*, 306 Mich App 713, 723; 858 NW2d 143 (2014). A fact finding is clearly erroneous if, although there is evidence to support it, upon reviewing the entire record, this Court is left with the definite and firm conviction that a mistake has been made. *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009) (quotation marks and citation omitted). Interpretation and application of statutes and court rules are reviewed de novo. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014).

A court "may authorize the filing of the petition upon a finding of probable cause that one or more of the allegations are true and could support the trial court's exercise of jurisdiction under MCL 712A.2(b)." *In re Ferranti*, 504 Mich 1, 15; 934 NW2d 610 (2019). See MCR 3.961(B)(3). If the petition is authorized, the court must determine whether the child should remain in the home, be returned to the home, or be placed in foster care pending trial. *In re Benavides*, 334 Mich App 162, 167; 964 NW2d 108 (2020). The trial court's placement decisions are governed by MCL 712A.13a(9) and MCR 3.965(C)(2). According to MCL 712A.13a(9):

---

[3] SG's and WG's father, JG, was also listed as a respondent to the petition. He was incarcerated at the time of the petition for a probation violation and due to the severity of a previous injury, was found mentally incompetent by the trial court.

The court may order placement of the child in foster care if the court finds all of the following conditions:

> (a) Custody of the child with the parent presents a substantial risk of harm to the child's life, physical health, or mental well-being.
>
> (b) No provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from risk as described in subdivision (a).
>
> (c) Continuing the child's residence in the home is contrary to the child's welfare.
>
> (d) Consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child.
>
> (e) Conditions of child custody away from the parent are adequate to safeguard the child's health and welfare.

The language of MCR 3.965(C)(2) substantially resembles that found in MCL 712A.13a(9).

The preponderance-of-the-evidence standard applies to cases where the trial court is merely assuming jurisdiction over the child, rather than terminating the parent's rights in the child. *In re Martin*, 167 Mich App 715, 725; 423 NW2d 327 (1988). Ordinarily, a trial court is not obligated to articulate extensive findings regarding every conceivable detail. *Rittershaus v Rittershaus*, 273 Mich App 462, 475; 730 NW2d 262 (2007), citing MCR 2.517(A)(2). But when a statute or court rule requires factual findings in connection with an enumerated list of factors, the trial court must make sufficient findings on each factor for this Court to conduct meaningful review. *Id*. at 475.

In this case, contrary to respondent-mother's argument, the record supports the trial court's findings of substantial risk of harm to the children's lives, physical health, or mental well-being, as required under MCL 712A.13a(9)(a). A CPS investigator, Michael Herriman, testified that two of the children had sustained multiple, serious physical injuries. Medical examinations, including a CT scan, revealed that SG had bilateral subdural (brain) hemorrhages of various ages along with bilateral multilayered retinal hemorrhages. The serious injuries were consistent with shaken-baby syndrome, and not with the report from respondent-mother that SG had fallen out of a high chair. Also, SG was diagnosed with severe malnutrition, and WG was diagnosed with a heart condition and fractured ribs along with similar brain bleeding that required hospitalization and placement of a drainage shunt.

The preliminary hearing did not bring to light which of the children's caregivers, including respondent-mother, Baker, and JG (SG's and WG's respondent-father), had caused those injuries. Herriman testified that an alternative hypothesis to shaken-baby syndrome was explored regarding a reported fall causing SG's injuries. But there was no alternative hypothesis that WG's suspected shaken-baby-syndrome injuries were caused by a fall. According to the medical records, during the hospital emergency session on April 10, 2024, respondent-mother did not make a disclosure, including any statement about the alleged fall from a high chair, that would explain SG's injuries.

Medical examiners had not yet determined when the injuries occurred. During cross-examination, Herriman testified that the injuries could have been sustained anywhere from a few days to a month before the date of diagnosis. Another CPS investigator, Theresa Jackson, opined that there was a substantial risk of harm for the children to be in the custody and care of respondent-mother, given the severity of the girls' injuries.

Respondent-mother argues that the trial court's findings that the children were "being hurt over time" was clearly erroneous because the timeframe for the children's injuries was not known. That argument is meritless. According to the medical evidence, the injuries were of various ages, indicating that they were not sustained during one event. Therefore, it was reasonable for the trial court to conclude that more than one incident had caused the children's injuries, and whether those incidents occurred over days or weeks, all three children were at a substantial risk of harm if they remained in respondent-mother's custody and care.

Respondent-mother's claim that the children's brain-bleed injuries themselves were not de facto proof of improper supervision is groundless. First, respondent-mother erroneously assumes that the trial court removed the children from her care solely because of improper supervision. The trial court manifestly concluded that the children had been in "an environment" that had subjected them to serious harm, and that the perpetrator only *might* be respondent-mother. Further, sufficient evidence supported the trial court's conclusion that the children's injuries resulted from more than a single incident, which reflected respondent-mother's improper supervision. Respondent-mother contends that she acted diligently with the information she had at the time, noting that she took SG to the hospital on the day SG allegedly fell out of a high chair, she sought medical care two days later when SG was repeatedly vomiting, and she sought emergency medical services when SG was found unconscious on April 16, 2024. Also, respondent-mother emphasizes that she immediately removed WG and ZT from Baker's home after SG was diagnosed with brain bleeds. Accordingly, respondent-mother insists that she complied with all the medical recommendations and otherwise exercised proper supervision.

Although the record reveals respondent-mother complied with medical recommendations for SG after April 16, 2024, Herriman testified that his review of the medical documents indicated that respondent-mother did not inform medical providers on April 10, 2024, that SG had allegedly fallen. Respondent-mother made no disclosures during that visit about possible injuries to SG or WG. There was testimony about the emergency room visit when SG was vomiting, but Herriman testified that he had no knowledge of that visit. Herriman further stated that respondent-mother did not take SG to a follow-up appointment with her primary-care doctor within one to three days, as the examining physician instructed on April 10, 2024. Also, in addition to brain bleeds, SG was diagnosed with severe malnourishment, and she had gained four pounds since being hospitalized. Further, respondent-mother was aware that CPS was investigating Baker for not properly feeding his own three children.

The record does not support respondent-mother's assertion that her due-process rights were violated because she was not permitted to cross-examine a witness about the credibility of hearsay statements of JG's girlfriend or to present evidence in support of her case. See MCR 3.965(C)(1). Respondent-mother claims her alleged failure to consent to a CT scan for WG on April 22, 2024, was central to the trial court's finding. Jackson testified that JG's girlfriend said that respondent-mother did not want the hospital to conduct a CT scan at that time. The trial court did not clearly

err in denying, on relevancy grounds, respondent-mother's efforts to cross-examine Jackson about the trustworthiness of JG's girlfriend's statement. The trial court had heard Herriman's testimony that he had spoken to respondent-mother and asked her to consent to have WG undergo a CT scan after SG's brain hemorrhages were discovered. Herriman commented that respondent-mother was indecisive, and that he ultimately contacted the hospital to request the test.

Further, respondent-mother's reluctance to consent to a CT scan was not the sole factor in the trial court's decision concerning improper care. It was part of the totality of circumstances that the trial court considered in determining that the children were at a substantial risk in respondent-mother's care. The trial court also considered that SG was severely malnourished at the same time Baker was being investigated for not feeding his own children. As the court correctly noted, severe malnourishment does not occur in just one night without food; it happens over time. Jackson also testified that JG was a convicted sex offender. Jackson added that respondent-mother was staying with JG for several days, but she did not admit to being in a relationship with him. Jackson further reported that ZT stated during a forensic interview that he saw respondent-mother and JG kissing on the morning of the interview. Jackson explained that respondent-mother knew that JG was not to be around children under the age of 17, and that he was incarcerated shortly after the children's removal for violating the terms of his felony probation.

In addition, Herriman testified that ZT stated during his forensic interview that respondent-mother had told him not to report anything that could get her into trouble. Herriman testified that ZT and WG stayed with Baker's neighbors while respondent-mother was at the hospital with SG, and that, after respondent-mother returned from the hospital, she "didn't have much to do with the kids," so the neighbors contacted Herriman and asked for the children to be moved. Respondent-mother's claim that there was no evidence that her home was unsuitable misses the mark. The key issue was respondent-mother's ability to keep the children safe as their caregiver, not the physical attributes of the home.

We further conclude that the trial court did not clearly err by removing the children under the doctrine of anticipatory neglect, which recognizes " '[h]ow a parent treats one child is certainly probative of how that parent may treat other children.' " *In re LaFrance*, 306 Mich App at 730, quoting *In the Matter of LaFlure*, 48 Mich App 377, 392; 210 NW2d 482 (1973). Although the record contains no evidence that ZT had been physically abused, the trial court did not clearly err by finding that he, too, was at a substantial risk of harm if he remained in respondent-mother's custody and care. ZT likely suffered mental harm by being in an environment where SG and WG were susceptible to physical abuse. Alternatively, respondent-mother's lack of proper supervision and care put ZT, who was seven years old, at similar risk. It was unnecessary for the trial court to make separate findings for each of the children.

Given all the evidence presented, the trial court did not clearly err in finding, for purposes of MCL 712A.13a(9)(b), that no adequate safeguards could be employed for the children to remain safely in respondent-mother's care because she at least shared the responsibility for the children's non-accidental serious injuries. Similarly, remaining in the home would have been contrary to the children's welfare for purposes of MCL 712A.13a(9)(c). Additionally, the trial court's placement of SG and WG in a licensed foster care home was adequate to safeguard the children's health and welfare, and the trial court ordered the DHHS to make reasonable efforts to work with respondent-mother with the goal of returning the children safely to her home.

-5-

Affirmed.

/s/ Sima G. Patel
/s/ Christopher M. Murray
/s/ Christopher P. Yates