*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re NELSON/CUTHBERTSON, Minors.

UNPUBLISHED
March 11, 2026
11:15 AM

No. 376298
Genesee Circuit Court
Family Division
LC No. 25-140738-NA

Before: KOROBKIN, P.J., and YATES and FEENEY, JJ.

PER CURIAM.

Respondent-mother appeals by right the trial court's June 12, 2025 order removing two minor children from her care until further order of the court pending the resumption of the preliminary hearing. Because the trial court did not clearly err in finding that it was contrary to the welfare of the children to remain in respondent-mother's custody, we affirm.

## I. BACKGROUND AND FACTS

The facts as alleged in the Department of Health and Human Services' (DHHS) June 2025 petition requesting that the court issue an order removing the children and, upon authorization, take jurisdiction over the children, are the following. DHHS received reports that respondent-mother tested positive for THC[1] shortly after she gave birth to her youngest child in November 2024. The youngest child's meconium test also revealed that the child was born positive for THC. While investigating the allegations regarding the youngest child's birth, Children's Protective Services (CPS) discovered that several phone calls to 911 for domestic violence originated from the address where respondent-mother and her children lived. As a result, CPS began providing services to respondent-mother.

---

[1] "Tetrahydrocannabinol, or THC, is the physiologically active component of marijuana." *People v Koon*, 494 Mich 1, 3 n 3; 832 NW2d 724 (2013) (citation omitted).

On March 27, 2025, respondent-mother informed CPS worker Cheryl Kociba of a domestic violence incident at her home. Specifically, respondent-mother's boyfriend gave respondent-mother a black eye and a large, black and blue bruise on her arm, which Kociba observed. Respondent-mother admitted to holding her youngest child "as a shield" to see if her boyfriend would still attack her. She stated that her boyfriend "did not care," and that he subsequently lunged at her while she was holding the youngest child. She further admitted that her boyfriend had been staying at the family home for the last four months despite a no-contact order set by the Department of Corrections before the initial CPS investigation because her boyfriend was on parole. Kociba informed respondent-mother that by staying in a relationship with her boyfriend and by allowing him into the family home despite the no-contact order, respondent-mother was putting her children in danger.

CPS held a family team meeting in April 2025 with respondent-mother and her children following "multiple recent domestic assaults" in the children's presence. During that meeting, a safety plan was developed in which respondent-mother was to inform her boyfriend that he was not allowed inside the family home. But respondent-mother stated that she wanted to continue her relationship with her boyfriend once he received substance abuse treatment. Respondent-mother was told that "child safety was the main concern" and that if she allowed her boyfriend back into the home and domestic violence continued, she risked court intervention and possible removal of her children. Respondent-mother confirmed that she understood the warning.

Kociba held another family team meeting with respondent-mother on May 14, 2025. During that meeting, Kociba reviewed the safety plan with her and respondent-mother agreed to not engage in verbal or physical altercations in the children's presence. Respondent-mother also was to call 911 if her boyfriend was being aggressive. Respondent-mother was aware of her resources, including those at the YWCA Women's Shelter, and had participated in Orchards Outreach Services' domestic violence intervention program.

On May 27, 2025, CPS investigator Alicia Robar received a report that police had responded to an attack on respondent-mother by her boyfriend with a hammer. Upon arrival at the family home, police observed red marks and what appeared to be blood on respondent-mother's face, and Robar later observed other injuries on respondent-mother's face, chest, arm, and shoulder. Robar reviewed a police report describing the attack and interviewed respondent-mother as well as her oldest child. Respondent-mother reported to police that she and her boyfriend had gotten into an argument because she was driving her oldest child to get some food. Relatedly, respondent-mother's oldest child informed Robar that respondent-mother and her boyfriend began arguing after the oldest child and respondent-mother "went to Burger King and took too long to get back home." The child stated that respondent-mother's boyfriend yelled at him and respondent-mother and called them liars. Respondent-mother explained to police that her boyfriend had hit her head three times with a hammer and later told Robar that her boyfriend also had pushed her down and dragged her by her hair. She additionally told Robar that she had attempted to call 911, but that her boyfriend knocked her phone out of her hands twice to prevent her from doing so. The children witnessed various portions of this incident. Respondent-mother's boyfriend was arrested and charged with felony assault with the intent to commit murder and with interfering with a communications device.

After meeting with respondent-mother on Friday, June 6, 2025, it was decided that CPS would petition for court involvement. On Monday, June 9, 2025, Robar was notified that respondent-mother was in jail for a vehicle-related incident that occurred at a Dairy Queen restaurant. After her youngest child started fussing, respondent-mother reversed her vehicle to leave the drive-through and then, when the vehicle behind her started honking, put her vehicle in park. Respondent-mother then placed her youngest child onto her lap in the driver's seat as the vehicle behind her continued honking. She then again put her vehicle in reverse, this time hitting the vehicle behind her. Respondent-mother later admitted to police that she intended to hit the vehicle. Respondent-mother drove off with her youngest child still on her lap and her oldest child elsewhere in the vehicle. Robar later testified that respondent-mother was charged with felony assault and with a child endangerment misdemeanor arising from this incident.

On June 11, 2025, DHHS filed a petition requesting that the trial court take jurisdiction over the children and issue an order removing the children. During the preliminary hearing on the petition the next day, respondent-mother and her counsel were present. Robar testified regarding the May 27, 2025 domestic violence incident and the Dairy Queen incident. In addition to describing many facts stated in the petition, Robar shared that, after the May 27, 2025 incident, respondent-mother obtained a personal protection order and had her boyfriend evicted. Robar further testified that "it's been reported through . . . the ongoing CPS worker that [respondent-mother] has told her that [respondent-mother's boyfriend] was staying with [respondent-mother]." Robar also described how she had spoken with Jason Nelson, the legal father of respondent-mother's oldest child, and his wife, and that they had agreed to take custody of both children. DHHS requested that respondent-mother's children be removed and clarified that, should they be removed, DHHS would likely place them both with the Nelsons. The children's lawyer-guardian ad litem supported the removal request and requested that the children be placed with the Nelsons to ensure they could stay together. Respondent-mother objected to removal.

The trial court adjourned the preliminary hearing and delayed deciding whether it would authorize the petition, but ordered the children removed from respondent-mother's care until further order of the court pending the resumption of the preliminary hearing on July 22, 2025. In doing so, the trial court clarified that it had reviewed the allegations in the petition[2] and considered Robar's testimony. The court acknowledged that respondent-mother was the victim of domestic violence but found that services related to domestic violence had been provided before the May 27, 2025 incident and that these services constituted reasonable efforts to prevent or eliminate the need for removal of the children. The trial court highlighted the family team meetings in April and May 2025, the safety plan, the police investigations, the information respondent-mother was given related to the YWCA, and respondent-mother's participation in Orchards Outreach Services.

The trial court stated that it relied on the history of the case and the services provided to support its conclusion that the children's safety was at risk. The trial court also noted "the unsafe conditions in the home, especially the history of domestic violence and in particular, the" May 27, 2025 incident in finding that it was contrary to the children's welfare to be in the home. The trial

---

[2] Robar, in signing the petition, declared under penalty of perjury that its contents were true to the best of her information, knowledge, and belief.

court explained that the Dairy Queen incident was "inherently dangerous" and that it "put[] into question . . . some judgment and some emotional issues." The trial court viewed the Dairy Queen incident and the May 27, 2025 domestic violence incident "as a culmination to find a basis to remove." The court also clarified that it found that custody of the children with respondent-mother "present[ed] a substantial risk of harm to [their] lives, physical health, and mental well[-]being" and that only removal of the children was "reasonably available to adequately safeguard the children from risk." In ordering the children removed from respondent-mother's custody, the court acknowledged that the children would thereafter be placed with the Nelsons.

This appeal followed.

## II. STANDARD OF REVIEW

We review for clear error a trial court's factual findings regarding grounds for removal. See *In re Benavides*, 334 Mich App 162, 167; 964 NW2d 108 (2020). A finding is clearly erroneous if we are "left with a firm and definite conviction that a mistake has been made." *In re Williams*, 333 Mich App 172, 178; 958 NW2d 629 (2020) (quotation marks and citation omitted).

## III. ANALYSIS

Respondent-mother argues that the trial court failed to make the factual findings necessary to remove her children under MCL 712A.13a(9) and MCR 3.965(C)(2). We disagree and conclude that the trial court did not clearly err in finding the pretrial placement factors enunciated in MCL 712A.13a(9) and MCR 3.965(C)(2) satisfied.

After conducting a preliminary investigation, DHHS may petition the Family Division of the circuit court to take jurisdiction over a child. *In re Ferranti*, 504 Mich 1, 15; 934 NW2d 610 (2019). The petition must contain "the essential facts that, if proven, would allow the trial court to assume jurisdiction over the child." *Id.* (cleaned up), citing MCR 3.961(B)(3) and MCL 712A.2(b). "When the D[H]HS petitions for removal of a child under MCL 712A.2(b), the court must hold a preliminary hearing or hearings and may authorize the petition 'upon a showing of probable cause that 1 or more of the allegations in the petition are true and fall within the provisions of [MCL 712A.]2(b).' " *In re Rood*, 483 Mich 73, 94-95; 763 NW2d 587 (2009), quoting MCL 712A.13a(2).

"The preliminary hearing is governed by MCL 712A.13a and corresponding provisions of MCR 3.965." *In re Rood*, 483 Mich at 95. Under MCR 3.965(B)(11), the court may adjourn the preliminary hearing for good cause, and "[i]f the preliminary hearing is adjourned, the court may make temporary orders for the placement of the child when necessary to assure the immediate safety of the child, pending the completion of the preliminary hearing and subject to subrule (C) . . . ." MCR 3.965(C)(1) in turn provides that if the children were "not released under subrule (B), the court shall receive evidence, unless waived, to establish that the criteria for placement set forth in subrule 3.965(C)(2) are present."

MCL 712A.13a(9) and the identical provision in MCR 3.965(C)(2), to which temporary orders for placement are subject, MCR 3.965(B)(11), authorize a trial court to order placement of a child into foster care[3] if the court finds that the following conditions have been satisfied:

      (a) Custody of the child with the parent presents a substantial risk of harm to the child's life, physical health, or mental well-being.

      (b) No provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from risk as described in subdivision (a).

      (c) Continuing the child's residence in the home is contrary to the child's welfare.

      (d) Consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child.

      (e) Conditions of child custody away from the parent are adequate to safeguard the child's health and welfare. [MCL 712A.13a(9); MCR 3.965(C)(2).]

"MCR 3.965(C)(2) and MCL 712A.13a(9) explicitly require that the trial court find *all* the factors prior to removing a child from a parent's care." *In re Williams*, 333 Mich App at 184. When a trial "court is merely assuming jurisdiction over [a] child," the preponderance of the evidence standard applies. *Id.* at 183 (quotation marks omitted), quoting *In re Martin*, 167 Mich App 715, 725; 423 NW2d 327 (1988). Although "the trial court must make a record of its findings as to each and every factor sufficient for this Court to conduct a meaningful review," trial courts are "generally not obligated to articulate extensive findings regarding every conceivable detail." *In re Williams*, 333 Mich App at 183, citing *Rittershaus v Rittershaus*, 273 Mich App 462, 475; 730 NW2d 262 (2007).

Respondent-mother first challenges the trial court's findings that pretrial placement factors (a) and (c) were satisfied. See MCL 712A.13a(9)(a) and (c); MCR 3.965(C)(2)(a) and (c). In

---

[3] DHHS contends that MCL 712A.13a(9) does not apply to respondent's oldest child because that child was placed with his father, "not in foster care." We disagree. MCL 712A.13a(1)(e) defines "foster care" to include "care provided to a juvenile in a relative's home under a court order." Thus, by ordering that respondent's oldest child be placed in the care of his father, a relative, the trial court ordered the placement of respondent's oldest child in foster care. See MCL 712A.13a(1)(j) (defining "relative" to include "an individual who is at least 18 years of age" and is "[r]elated to the child within the fifth degree by blood, marriage, or adoption"). See also *In re Kowitz*, unpublished per curiam opinion of the Court of Appeals, issued May 16, 2024 (Docket No. 368436), p 5 (concluding that "[i]t . . . appears that ordering placement of a child with their legal parent could constitute ordering placement of the child in foster care"). We therefore proceed to review the trial court's application of the MCL 712A.13a(9) factors in its placement of respondent's oldest child.

explicitly concluding that custody of the children with respondent-mother presented a substantial risk of harm to the children under factor (a) and that the children continuing to reside in the home was contrary to their welfare under factor (c), the trial court explained that it viewed the May 27, 2025 domestic violence incident and the Dairy Queen incident "as a culmination to find a basis to remove." It further noted "the unsafe conditions in the home, especially the history of domestic violence," and described the Dairy Queen incident as an "inherently dangerous" situation that "puts into question . . . some judgment and some emotional issues." See *In re Williams*, 333 Mich App at 183-184 (concluding that respondent-mother's exhibition of "poor judgment" adequately supported the trial court's finding that factors (a) and (c) were satisfied).

Additionally, numerous allegations in the petition, upon which the trial court received testimony and which the trial court confirmed that it had reviewed, supported the court's findings that factors (a) and (c) were satisfied. For example, the petition described how the March 27, 2025 domestic violence incident involved respondent-mother using her younger child "as a shield" against her boyfriend's violence and stated that multiple incidents of domestic violence occurred in the children's presence. The petition also described how respondent-mother allowed her boyfriend to live with her despite the no-contact order and that she was warned that allowing her boyfriend to be in the home placed the children in danger.[4] In addition, the oldest child's statement to Robar that respondent-mother's boyfriend became upset on May 27, 2025 over the length of time it took the oldest child and respondent-mother to return home indicates that respondent-mother had permitted her boyfriend back into her home before the May 27, 2025 incident despite CPS's warning and the no-contact order. This also accords with Robar's testimony that respondent-mother had her boyfriend evicted after the May 27, 2025 incident and that she told the ongoing CPS worker that her boyfriend had been staying with her. In light of this evidence, we see no clear error in the trial court's finding that the custody of the children with respondent-mother presented a substantial risk of harm to the children and that the children continuing to reside in the home was contrary to their welfare. See MCL 712A.13a(9)(a) and (c); MCR 3.965(C)(2)(a) and (c).

Nor are we persuaded by respondent-mother's argument that the trial court failed to articulate factual findings in concluding that factors (b) and (e) were satisfied. See MCL 712A.13a(9)(b) and (e); MCR 3.965(C)(2)(b) and (e). In ordering the children removed from

---

[4] Contrary to respondent-mother's argument, we see no error in the court's consideration of past domestic violence in the home under the circumstances of this case. Although a trial court may not terminate parental rights solely because a parent was a victim of domestic violence, a court may consider a parent's own behaviors that cause children direct harm or expose them to harm. See *In re Plump*, 294 Mich App 270, 273; 817 NW2d 119 (2011). Respondent-mother's continuation of her relationship with her boyfriend exposed the children to harm, and the trial court thus did not err in finding that the domestic violence created "unsafe conditions" for the children. See *In re Gonzales/Martinez*, 310 Mich App 426, 432; 871 NW2d 868 (2015) (finding no clear error in the trial court's termination of a mother's parental rights when "[t]he evidence established that respondent-mother placed her desire to be with her boyfriend—despite his abuse—over the needs of her children, and there was evidence that she would likely continue to place her personal desires over her children's welfare").

respondent-mother's custody, the trial court explained "that services were given to the respondent mother well before the unfortunate incident in May," specifically noting her participation in Orchards Outreach Services, the safety plan, the information she was given about the YWCA, the police investigations, and the family team meetings in April and May 2025. These findings were supported by detailed allegations in the petition. The trial court's discussion illustrates its determination that despite DHHS's ongoing engagement with respondent-mother, the children continued to face a risk of harm in her care, leaving removal as the only viable option to safeguard the children from that risk. The trial court also considered Robar's testimony that the Nelsons had agreed to take placement of the children and agreed with the LGAL that placing the children together would be in their best interests. The trial court thus did not clearly err in finding that only removal of the children would adequately safeguard them from the substantial risk of harm they faced and that the conditions of custody away from respondent would adequately safeguard their health and welfare. See MCL 712A.13a(9)(b) and (e); MCR 3.965(C)(2)(b) and (e). See also *In re Benavides*, 334 Mich App at 169-170 (rejecting the respondent's argument that an alternative safety plan would have sufficiently protected the children when there was ongoing harm to the children while DHHS was involved).[5]

Finally, the trial court committed no clear error in finding that reasonable efforts had been made to prevent removal of the children under factor (d). See MCL 712A.13a(9)(d); MCR 3.965(C)(2)(d). The trial court found that DHHS made reasonable efforts to prevent removal by holding family team meetings, providing safety plans, counseling respondent-mother against ongoing contact with her boyfriend, and referring respondent-mother to services provided by the YWCA and Orchards Outreach Services. Given the evidence of extensive DHHS engagement with respondent-mother, we see no clear error in the trial court's finding that these constituted reasonable efforts to prevent removal. See MCL 712A.13a(9)(d); MCR 3.965(C)(2)(d). Compare *In re Williams*, 333 Mich App at 184 (finding clear error when the trial court failed to consider whether DHHS had made any efforts to prevent removal), with *In re Benavides*, 334 Mich App at 169-170 (finding no clear error when, among other evidence, one of respondent's children was injured after the respondent received a treatment plan from DHHS and the "respondent had not engaged in and benefited from the services").

---

[5] See also *In re Neill*, unpublished per curiam opinion of the Court of Appeals, issued June 24, 2021 (Docket No. 355990), p 4 (concluding that MCR 3.965(C)(2)(b) was satisfied because the continuing domestic violence despite DHHS's "extensive history of engagement with the family supported a finding that removal was the only way to safeguard the children" and finding that "[r]emoval from the respondents was adequate to safeguard the child's health and welfare" under MCR 3.965(C)(2)(e) "because the threat to the child's safety and welfare arose from violence within the home"). "Unpublished opinions of this Court are not binding, but may be considered for their persuasive value." *In re Walters*, ___ Mich App ___, ___ n 5; ___ NW3d ___ (2025) (Docket No. 369318); slip op at 6 n 5.

In sum, the trial court did not clearly err in finding satisfied each of the factors necessary to order removal of respondent-mother's children. See MCL 712A.13a(9); MCR 3.965(C).

Affirmed.

/s/ Daniel S. Korobkin
/s/ Christopher P. Yates
/s/ Kathleen A. Feeney